**EXHIBIT 2**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**

| | |
|---|---|
| IN THE MATTER OF <br><br> Mary M. Cowan <br><br> Respondent. | File No. D2017-0363 <br><br> IN PRACTIONER DISCIPLINARY PROCEEDINGS <br><br> Date: December 8, 2020 |

**ON BEHALF OF RESPONDENT:**

William G. Walker, Esq.
Attorney for Respondent

**ON BEHALF OF EOIR & DHS:**

Paul A. Rodrigues, Esq.
Disciplinary Counsel

Catherine M. O'Connell, Esq.
Disciplinary Counsel

---

## FINAL ORDER AND DECISION OF THE ADJUDICATING OFFICIAL

The Disciplinary Counsel for the Executive Office for Immigration Review (Disciplinary Counsel or government) seeks to suspend Ms. Mary M. Cowan (respondent) from the practice of law before the Immigration Courts, Board of Immigration Appeals (BIA or Board), and the Department of Homeland Security (DHS) for no less than two years. The respondent disagrees and argues that any suspension will not be in the public's interest. For the reasons stated below, this Court concludes that the government has met its burden to establish that the respondent violated the rules of professional conduct and that a suspension from the practice of law before the Immigration Courts, Board, and the DHS is appropriate. That suspension shall be indefinite, but for no less than five years. The respondent may seek reinstatement to practice before the Immigration Courts, Board, and the DHS after five years, and the Board may decide whether reinstatement is appropriate given the respondent's egregious violations of the professional code of conduct. Prior to reinstatement, however, the respondent shall file an affidavit, under oath, explaining the changes she has made to her practice to ensure the violations detailed herein are not repeated.

//

## I.   BACKGROUND AND PROCEDURAL HISTORY[1]

Mary M. Cowan is an attorney licensed to practice law in the State of Arizona.[2]  On August 15, 2019, the Disciplinary Counsel filed a Notice of Intent to Discipline (NID) with the Board.  The NID charges Ms. Cowan with twenty-four separate counts of violating various sections of the federal regulations governing the practice before the Immigration Courts and the Board.  On October 31, 2019, the Board issued a decision forwarding the record to the Office of Chief Immigration Judge for the appointment of an Adjudicating Official.[3]  This Court was appointed to be the Adjudicating Official on March 10, 2020.

On April 15, 2020, this Court scheduled a pre-hearing conference for May 15, 2020.  Four days before the hearing, the respondent filed a pre-hearing memorandum raising a number of issues.  Among the issues she raised was that neither this Court nor any judge from the Phoenix or Tucson Immigration Courts should be the Adjudicating Official in her disciplinary case.  At the pre-trial conference, the respondent elaborated on her request to reassign her case to a different judge.  She argued that the regulations require that her case should not be heard by any judge that the respondent "regularly appears" before.  The government disagreed, arguing that the regulations do not preclude this Court from hearing the respondent's case.

On May 18, 2020, this Court issued an order memorializing the deadlines discussed at the pre-trial conference and provided various requirements for filing motions, exhibits, and witness lists.  In its May 2020 order, this Court also reminded the parties that it held its decision on the respondent's motion to recuse in abeyance because it had not yet received the respondent's memorandum filed days before the hearing.  At the pre-trial conference, the respondent stated that she filed the memorandum via FedEx, but clerical staff notified this Court that the memorandum had not been received.  As such, in its scheduling order this Court gave the respondent until May 20, 2020, to file her pre-trial

---

[1]  Some of the background and procedural history of this case was taken from this Court's order denying the respondent's motion to recuse it from hearing her case.  (*See* Exh. 5 at 1-2.)

[2]  According to an affidavit filed with a motion to recuse, Ms. Cowan is also "on 'inactive-retired' status in the Commonwealth of Pennsylvania."

[3]  Prior to the Board's decision, the DHS filed a motion requesting reciprocal discipline, meaning that any disciplinary decision made in this case should equally apply to appearances before the DHS.  The respondent filed an opposition to the motion, but the Board granted the motion because the regulations permit the DHS to request reciprocal discipline.

conference memorandum with the Court, and required that a courtesy copy be emailed to court staff. The respondent timely emailed a courtesy copy to court staff.[4]

## A. Summary of Prior Orders Issued by this Court

On June 8, 2020, this Court issued an order denying the respondent's motion to recuse itself from her disciplinary case. (Exh. 5.) This Court found that the regulations preclude an Adjudicating Official from presiding over a disciplinary case if the official is "the complainant" or in any case "involving a practitioner who regularly appears before the Judge[.]" (*Id*. at 3) (citing 8 C.F.R. § 1003.106(a)(2)(i)). Based on these regulations, this Court concluded that the respondent does not regularly appear before the Court and thus recusal was unwarranted. (*Id*. at 4-5.)

In accordance with this Court's order providing a briefing schedule for motions, on June 4, 2020, the government filed a motion for this Court to find that the respondent's answer to the NID constituted an admission to all of the factual allegations set forth in the NID. As such, in accordance with the regulations, the government asked that this Court deem that the respondent admitted all of the factual allegations in the NID. On July 20, 2020, the respondent filed a timely response to the government's motion. On September 3, 2020, this Court issued an order granting the government's motion in part and denying it in part. (Exh. 11.) In this Court's September 2020 order, it found that the respondent failed to properly deny the factual allegations in the NID in all but five factual allegations. (*Id*.) This Court's order further stated that the government need not present any additional evidence on the factual allegations the Court deemed admitted, but did require the government to present evidence on the five denied factual allegations in the NID that the Court did not deem admitted.[5] (*Id*. at 8.)

A second pre-trial conference was held on September 8, 2020, based on a request from the government and without objection from the respondent. In its order scheduling the second pre-trial conference, the Court instructed the government to appear via video

---

[4] The respondent also provided proof that she mailed a hard copy of the pre-trial memorandum to the Court prior the pre-trial conference.

[5] It should be noted for the sake of clarity that the Court's September 2020 order did not find that the respondent violated the rules of professional conduct. Instead, it was only ruling on the government's motion, which asked that the Court find that the respondent failed to specifically deny the allegations in the NID and thus deem the allegations admitted. (Exh. 11.) Indeed, the Court's order specifically referenced that the government was not arguing that the Court should find that the respondent violated the rules of professional conduct solely based on her answer. (*Id*. at 6.)

teleconference (VTC) because the government filed a motion requesting that it be allowed to do so. It also instructed the respondent to appear at the Tucson, Arizona, Immigration Court, and the Court notified the parties that it would appear via VTC from the Phoenix Immigration Court. The purpose of the Court appearing via VTC was for it to determine whether it could effectively conduct the disciplinary hearing via VTC.

At the hearing, this Court notified the parties of the rules related to conducting the hearing due to the COVID-19 pandemic. Specifically, the parties were notified that no more than four individuals could be in the courtroom at one time and no more than 10 individuals could be in the lobby area of the courthouse. No party objected to these requirements.

### B. Rulings on Pending Motions Discussed at the Second Pre-Trial Hearing

At the September 8, 2020 pre-trial conference, this Court ruled on a number of objections filed by the government related to the respondent's witnesses and exhibits. The government filed motions *in limine* to preclude all of the respondent's witnesses from testifying, arguing that "none of the individuals have any personal knowledge of the conduct at issue" and none had "specialized knowledge of the Rules of Professional Conduct (Rules) and whether Respondent's conduct may have violated the Rules." (Govt's Objxn to Respondent's Witnesses at 2.) Ultimately, the government stated that it believed the witnesses were cumulative, and only offered character and reputation evidence. (*Id.*) The Disciplinary Counsel proposed that in lieu of testimony the government would stipulate to the admission of affidavits from the witnesses "for the sole purpose" of considering the testimony "in determining the appropriate sanction, if any" to impose. (*Id.*) The Disciplinary Counsel also objected to five of the respondent's proposed exhibits (namely exhibits A-D) because they are irrelevant to the proceedings.[6] (*Id.*)

This Court gave the respondent an opportunity to respond to the government's objections at the final pre-trial hearing. The respondent argued that the witnesses are relevant because this Court is obligated to determine whether disciplining the respondent is in the public interest and the witnesses will help inform this Court's decision. She further asserted that the exhibits are relevant because they will help the Court understand the current state of the respondent's *pro bono* practice before the Immigration Courts and the Board.

---

[6] These exhibits are part of Exhibit 6, Tabs A-J.

After considering the objections and the arguments of the parties, this Court overruled the government's objections. It found that the witnesses were not cumulative because each witness knew the respondent in a different capacity and for varying lengths of time. It also concluded that the witnesses would help the Court determine the appropriate sanction, if any, to impose on the respondent.[7] Finally, this Court found the exhibits were relevant to demonstrate the effect any sanction may have on the public.

The government filed a pre-trial brief, but sought permission to file a brief longer than 25 pages. The respondent did not object, but sought permission to file her own pre-trial brief. The Court granted the government motion and the respondent's request. The Court also granted the government's request to appear via VTC for the disciplinary hearing. The respondent did not object to the government's appearance via VTC, but objected to this Court's appearance via VTC, arguing that live testimony is necessary to access witness credibility "and issues as to 'public interest[.]'" (Respondent's Mtn at 1.) In the alternative, the respondent sought to continue her disciplinary hearing "until such time as a full, in-person hearing can be scheduled." (*Id.*)

This Court overruled the respondent's objection regarding appearing via VTC at the September 8, 2020 pre-trial hearing for the following reasons. The respondent's objection to the Court's appearance via VTC was untimely. *See* 8 C.F.R. § 1003.31(c) (stating that the opportunity to file documents "shall be deemed waived" if a respondent fails to timely file documents with the Court based on the Court imposed deadline); *Matter of R-C-R-*, 28 I&N Dec. at 74, 77-78 (BIA 2020).[8] The scheduling order issued by this Court on May 18, 2020, specifically required that all substantive motions be filed no later than August 21, 2020. The parties were aware that this Court was considering appearing via VTC for the disciplinary hearing because it was discussed at the first pre-trial conference on May 15, 2020. Nonetheless, the respondent filed no substantive motions by the court imposed deadline.

In any event, even if the respondent's objection was timely, this Court still concludes that the objection is without merit. Immigration Judges have "broad discretion to conduct and control" proceedings. *Matter of R-C-R-*, 28 I&N Dec. at 77. Immigration

---

[7] The parties were reminded, however, that should the witnesses testify differently than the summary provided by the respondent and that testimony appeared to be irrelevant or cumulative, the government could renew its objection at the disciplinary hearing.

[8] Because disciplinary hearings are to be conducted "in the same manner as Immigration Court proceedings as is appropriate" this order relies on case law and regulations that apply to the Immigration Courts. 8 C.F.R. § 1003.106(a)(2)(v).

proceedings may be conducted via VTC because the "Act and implementing regulations specifically provide for hearings via video conference." *Id.* 80 (citing INA § 240(b)(2)(A)(iii) and 8 C.F.R. § 1003.25(c)). "This authority has been consistently recognized by the courts of appeals." *Id.* (citations omitted). Disciplinary proceedings, like immigration proceedings, must be conducted "in accord with due process standards of fundamental fairness." *Matter of R-C-R-*, 28 I&N Dec. at 81. "Due process requires that respondents . . . must be given an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (citations and internal quotation marks omitted). A hearing conducted via VTC "does not necessarily deny due process." *Vilchez v. Holder*, 682 F.3d 1195, 1199 (9th Cir. 2012). There is no *per se* violation of a respondent's due process rights merely because a hearing is conducted via VTC. *Id.* To establish a due process violation, the respondent must show "(1) the proceedings was so fundamentally unfair that [she] was prevented from reasonably presenting [her] case, and (2) the [respondent] demonstrates prejudice, which means the outcome of the proceedings may have been affected by the alleged violation." *Id.* (citation omitted). Due process violations require a case-by-case assessment and it depends on "the degree of interference with the full and fair presentation of [the respondent's] case caused by the video conference, and on the degree of prejudice suffered by" the respondent. *Id.* at 1199-1200.

In this case, the respondent has demonstrated no interference in presenting her case nor has she demonstrated any prejudice. This Court was able to observe the witnesses and the parties were able to ask questions of all of the witnesses. The witnesses were able to view documents when necessary and the Court was able to follow along because it had all of the documents before it throughout the proceedings. In short, conducting the respondent's hearing via VTC neither precluded the respondent from presenting her case, nor prejudiced her in any way.

## II.    EVIDENCE PRESENTED

The disciplinary hearing commenced on September 21, 2020, and concluded on September 25, 2020.[9] This Court has considered all of the evidence of record, even if not explicitly mentioned.[10] The following documents were admitted into evidence.

---

[9] This Court encouraged the parties to discuss settlement of this case at both pre-trial hearings. The Court also notified the parties that if a resolution of the case could be made the parties may notify the Court on the first day of the scheduled disciplinary hearing. No settlement was reached by the parties.

[10] While the party's motions and briefs were not marked as exhibits, this Court considers the entire file in the respondent's disciplinary case, even not explicitly mentioned, as is required

## A. Documentary Evidence

| Exhibit 1 | Notice of Intent to Discipline, pages 1-42 |
|---|---|
| Exhibit 2 | Government's Initial Exhibits, pages 1-724 |
| Exhibit 3 | Respondent's Answer, pages 1-88, *Operating Policies and Procedures Memorandum* 08-01, Attachments 3-4 and Exhibits A-F |
| Exhibit 4 | Board of Immigration Appeals Order, dated October 31, 2019 |
| Exhibit 5 | Adjudicating Official's Order, dated June 8, 2020, Related to Motion to Recuse |
| Exhibit 6 | Respondent's Index of Exhibits (Tabs A-J) |
| Exhibit 7 | Respondent's List of Witnesses, Anticipated Testimony, and Attachments |
| Exhibit 8 | Government's Witness List |
| Exhibit 9 | Government's Supplemental Exhibits and Amended Table of Contents, pages 725-739 |
| Exhibit 10 | Government's Supplemental Exhibits and Amended Table of Contents, pages 740-766 |
| Exhibit 11 | Adjudicating Official's Order dated September 3, 2020, Related to Motion to find Respondent Admitted Factual Allegations |
| Exhibit 12 | Respondent's Second Supplemental Exhibits and Amended Table of Contents, Attachments K-L |

## B. Testimonial Evidence

The parties made opening statements prior to the commencement of testimony. The government called two witnesses—the Honorable Immigration Judges Thomas M. O'Leary and Sean H. Keenan.[11] The respondent called 10 witnesses—Mr. Philip Stump Kennedy; Ms. Lynn Marcus; Mr. Andy Silverman; Ms. Jenna Johnson; Reverend (Retired) John Fife; the Honorable Mayor Regina Romero; Ms. Alison Harrington; Mr. Bates Butler; the Honorable Ron Barber; and the respondent.[12] The government did not present rebuttal

---

by the regulations. *See* 8 C.F.R. § 1003.103(a)(2)(iv) (stating that "in rendering a decision, the adjudicating official shall consider the following: the complaint, the preliminary inquiry report, the Notice of Intent to Discipline, the answer, any supporting documents, and any other evidence, including pleadings, briefs, and other materials")

[11] The government's witness list had a third witness—the respondent—as a potential witness. (*See* Exh. 8.) The government chose not to call the respondent has a witness in its case-in-chief.

[12] The respondent's witness list had 14 witnesses listed, but the respondent chose only to call nine of the 14 witnesses.

witnesses or evidence. Both parties gave closing arguments and the case was adjourned for this Court to issue a written decision.

## III.    THE DISCIPLINARY HEARING:  FINDINGS OF FACT

As noted above, the NID alleged 24 separate counts of violations of the professional code of conduct with 285 separate factual allegations. This Court has previously held that the government had proven all but five of those allegations—namely factual allegations 11, 12, 177, 178, and 260—were proven and no further evidence was required because the respondent failed to properly deny the factual allegations in her answer. (Exh. 11.) Based on this finding, this Court will not further analyze the 285 factual allegations to determine whether they have been proven, but instead will only focus on the five factual allegations that remain outstanding.

The burden lies with the government to prove "the grounds for disciplinary sanctions enumerated" in the NID "by clear and convincing evidence." 8 C.F.R. § 1003.106(a)(iv). In this Court's order stating that factual allegations 11 and 12 were not proven, it inadvertently failed to indicate that factual allegation 13 was the actual allegation that the respondent denied in her answer. (*See* Exh. 3 at 6) (stating that factual allegation is factually inaccurate). Therefore, this Court amends its prior order to find that factual allegation was similarly denied. *See* 8 C.F.R. § 1003.23(b)(1) (stating that an Immigration Judge may own his own motion "reconsider any case in which he. . . has made a decision, unless jurisdiction is vested with" the Board). This reconsideration does not prejudice either party. The respondent testified about each count in the NID and the government presented all of its evidence against the respondent. Moreover, neither party requested that this Court clarify its prior ruling.

In any event, this Court concludes that the government has established by clear and convincing evidence that factual allegations 11, 12, and 13 are proven. The government alleged that the respondent filed a statement with the Board of Immigration Appeals stating the reasons she did not file a brief even after being granted an extension to do so. (Exh. 1 at ¶ 11.) It further alleged that the Board took this motion to be a request to extend the briefing schedule a second time. (*Id.* at ¶ 12.) Four days later, the BIA denied the request as untimely. (*Id.*) Finally, the government asserted that the appeal was summarily dismissed because the respondent's "statements in the Notice of Appeal did not meaningfully apprise the Board of the reasons for the appeal and because, within the timeframe set for filing, Respondent did not file an appeal brief or otherwise notify the Board about her inability to do so." (*Id.* at ¶ 13.) The respondent claims that the allegation in factual statement 13 is inaccurate and she testified that she notified the Board that no

brief would be filed. (Exh. 3 at 6.) The record shows otherwise. The allegation is not that the respondent failed to file an extension at all, but rather that she failed to explain her inability to file an appeal within the time set for filing a brief. (*See* Exh. 1 at ¶ 13.) This allegation is proven by the government's documentary evidence and the respondent's own words in her motion to the Board. (Exh. 2 at 27.) The deadline to file a brief was extended to October 11, 2016, but the respondent did not notify the Board that she was unable to meet the extension deadline until November 4, 2016, nearly a month later, and well after the deadline to file the brief had past. (Exh. 2 at 17.)

Factual allegations 177 and 178 relate to a motion to reopen filed before Judge Keenan. (Exh. 1 at ¶¶ 177-78.) Both factual allegations are offered in support of Count 17 of the NID, which alleges that the respondent failed to file an application on her client's behalf by the court's imposed deadline. (*Id*. at 24-25.) Due the respondent's failure, her client's application for relief was deemed abandoned and her client was ordered removed. (*Id*. at ¶ 176.) The respondent's client obtained new counsel, who filed a motion to reopen arguing the respondent was ineffective for failing to file an appeal. (*Id*. at ¶ 177.) The motion was allegedly granted by Judge Keenan. (*Id*. at ¶ 178.) In her answer, the respondent stated that the allegation that she was ineffective is untrue. (Exh. 3 at 61.) The respondent blamed her client for failing to provide any documentary information to support her application for relief. (*Id*. at 60-61.) She reiterated the same argument in her testimony before this Court, claiming that her client's assertions are implausible. This Court disagrees and finds that factual allegations 177 and 178 are supported by clear and convincing evidence. The government's submission demonstrates that a motion to reopen was filed, was based on ineffective assistance of counsel, and was granted by Judge Keenan. (Exh. 2 at 428-439.) Judge Keenan testified to the same at the disciplinary hearing. While the respondent asserts that she was not ineffective, that was not the basis of the allegations in the NID. Instead, the factual allegations merely set forth the timeline, the basis for the motion to reopen, and Judge Kennan's decision on the motion. As such, this Court concludes that factual allegations 177 and 178 have been proven by clear and convincing evidence.

Factual allegation 260, which relates to the respondent's alleged failure to comply with a court-ordered biometrics requirement, states that the respondent "presented a notice from USCIS and alleged that it demonstrated that the biometrics fee had been paid." (Exh. 1 at ¶ 260.) In response, the DHS asserted "that the notice was proof that the application had been filed, but that it did not demonstrate that the biometrics fee had been paid." (*Id*.) In her answer, the respondent stated that the DHS's response discussed in factual allegation 260 is "patently inaccurate[]" and she reiterated this position at her disciplinary hearing.

(Exh. 3 at 80.) This Court concludes that the government has proven this factual allegation by clear and convincing evidence based on the respondent's own statements made to Judge O'Leary at the time of the alien's individual hearing. At the hearing, the DHS notified Judge O'Leary that biometrics had not yet been completed. (Exh. 2 at 579.) The respondent was asked to explain the reason biometrics were not completed. (*Id*. at 580.) The respondent provided a receipt notice to the Court and explained that she sent $185 to the government when she submitted her client's application for relief, but the fee receipt only shows that a fee was paid for the application and not the biometrics fee. (*Id*. at 582-83.) In fact, the respondent admitted that "the fee notice amount received does not include the biometric fee of $85." (*Id*. at 582.) This admission demonstrates that the government has proven this factual allegation by clear and convincing evidence.

All remaining factual allegations not discussed in this order have already been proven based on this Court's prior order finding that the respondent failed to properly deny the factual allegations in the NID. (Exh. 11.)

## IV.    THE DISCIPLINARY HEARING

As this Court previously stated in a prior order, there are three types of disciplinary proceedings that may affect a practitioner's ability to appear before Immigration Courts or the Board—immediate suspension, summary disciplinary proceedings, and proceedings in which a practitioner has a full hearing.[13] *See* 8 C.F.R. §§ 1003.103 *et seq* and 1003.106 *et seq*; (*see also* Exh. 11 at 2-4.) The respondent's case falls into proceedings in which a practitioner has requested a full hearing. Disciplinary counsel bears the burden to prove the grounds for disciplinary sanctions by clear and convincing evidence. 8 C.F.R. § 1003.106(a)(iv). In the event "one or more grounds for disciplinary sanctions enumerated in the [NID] have been established by clear and convincing evidence," the Adjudicating Official "shall rule that the disciplinary sanctions set forth in the [NID] be adopted, modified, or otherwise amended." 8 C.F.R. § 1003.106(b). All grounds in the NID "that have not been established by clear and convincing evidence shall be dismissed." *Id*.

The parties agree that the NID sets forth three categories of violations of the code of professional conduct. First, Counts 1-11 relate to claims that the respondent failed to provide specific grounds for an appeal and she failed to file an appeal after affirmatively stating an intent do so in the Notice of Appeal. These counts also allege that the respondent

---

[13] These same procedures apply to accredited representatives. 8 C.F.R. § 1003.106 *et seq*. Because the respondent is a licensed attorney, this order only refers to practitioners or attorneys rather than accredited representatives.

did not timely notify the Board that she did not intend to file an appeal in any of the cases listed in the NID. Second, Counts 12-16 and Count 19, allege that the respondent failed to file court-ordered briefs by the court imposed deadlines. Finally, Counts 17-18 and Counts 20-24 allege that the respondent failed to file applications or ensure that her clients' completed biometrics by court-imposed deadlines. Based on the respondent's conduct, the government charged the respondent with violating four different sections of the code of professional conduct—(1) 8 C.F.R. § 1003.102(j) (frivolous behavior); (2) 8 C.F.R. § 1002.102(n) (conduct prejudicial to the administration of justice); (3) 8 C.F.R. § 102(o) (competence); and (4) 8 C.F.R. § 1003.102(q) (diligence and promptness).

## A. STATEMENT OF LAW

Frivolous behavior includes actions that the practitioner "knows or reasonably should have known" lacks an "arguable basis in law or in fact[.]" 8 C.F.R. § 1003.102(j). Examples of such behavior include filing an appeal without first inquiring under the circumstances that an appeal "is well-grounded in fact and is warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law and is not interposed for any improper purpose." 8 C.F.R. § 1003.102(j)(1). This section of the code of professional conduct assumes that the practitioner has formed her opinion after a reasonable inquiry under the circumstances. *Id.*

Conduct that is prejudicial to the administration of justice or undermines the integrity of the adjudicative process includes "any action or inaction that seriously impairs or interferes with the adjudicative process when the practitioner should have reasonably known to avoid such conduct[.]" 8 C.F.R. § 1003.102(n).

Competent representation requires that a practitioner has "the legal knowledge, skill, and thoroughness, and preparation reasonably necessary for the representation." 8 C.F.R. § 1003.102(o). In order to competently handle a particular matter, a practitioner must inquire into and analyze "the factual and legal elements of the problem, and use. . . methods and procedures" to meet the standards of a competent practitioner. *Id.*

A practitioner must act "with reasonable diligence and promptness in representing" her client. 8 C.F.R. § 1003.102(q). In so doing, a "practitioner's workload must be controlled and managed so that each matter can be handled competently." 8 C.F.R. § 1003.102(q)(1). A practitioner must also "act with reasonable promptness." 8 C.F.R. § 1003.102(q)(2). This requires that the practitioner comply "with all time and filing limitations." *Id.*

## B. FINDINGS RELATED TO VIOLATIONS OF PROFESSIONAL CODE OF CONDUCT

### 1. Counts 1-11

In Counts 1-11, the government alleges that the respondent failed to provide specific grounds for an appeal and she failed to file an appeal after affirmatively stating an intent do so in the Notice of Appeal. These counts also allege that the respondent did not timely notify the Board that she did not intend to file an appeal in any of the cases listed in the NID. The respondent asserts that she did not file briefs because her clients chose not to do so, engaged in criminal activity which could make success on appeal unlikely, or the respondent failed to discovery any appealable issues after her review of the record and the transcript of proceedings.

#### a. *The Respondent Engaged in Frivolous Behavior as it Relates to Counts 1-9 and Count 11*

On 10 of 11 separate occasions, the respondent acted frivolously by filing an appeal with the Board without first making a reasonable effort to determine whether the appeal was well-grounded in fact and warranted by existing law or an extension or modification of the law. By her own admission in her answer and at the disciplinary hearing, the respondent was unable to make that decision until she reviewed the entire record, which included all of the transcripts of the proceedings and the Immigration Court's Record of Proceeding (ROP). Yet in every one of the 11 counts, the respondent filed a Notice of Appeal wherein she alleged that an Immigration Judge "erred as a matter of law." (Exh. 1 at ¶¶ 4, 18, 30, 40, 50, 62, 74, 84, 94, 106, and 118.) In Count 3, the respondent added a conclusory statement that her client "established that he is eligible for a favorable grant of asylum and withholding and was, indeed, tortured and is justified in his belief that he would be tortured if he were removed to Mexico and, therefore, is eligible for protection pursuant to the Convention Against Torture." (*Id.* at ¶ 30.) In one instance, the respondent explicitly alleged that she would elaborate the basis of her appeal in her brief (*Id.* at ¶ 4), but in all cases she notified the Board that she would file a brief. (*Id.* at ¶¶ 5, 19, 31, 41, 51, 63, 75, 85, 95, 107, and 119.) The respondent, however, never filed a brief in any of the 11 cases detailed in the NID. (*Id.* at ¶¶ 12-13, 23, 34-35, 44-45, 56-57, 68-69, 78-79, 88-89, 100-101, 112-13,124-25.) Instead, the Board summarily dismissed her client's appeals in every case. (*Id.*) As she admitted at the disciplinary hearing, it was her practice to allow the Board to summarily dismiss any appeal she filed when she decided not to file a brief.

In an attempt to explain her conduct, the respondent stated in her answer and reiterated in her testimony before this Court, that it is nearly impossible to "initiate writing of appeal brief and/or initiate specific legal research until one has the completed written transcript of proceedings to review for error." (Exh. 3 at 8.) It was thus her practice to file a Notice of Appeal so that she could review the transcripts in the case to determine the possible legal issues even if she was counsel of record before the Immigration Judge. (*See id.*) She admits in her answer that after a review of the record for all but two of the 11 cases listed in the NID, she did not identify any appealable issues and therefore notified her clients that the appeal would be dismissed.[14] (*Id.* at 1-43.) Filing a Notice of Appeal and stating that the judge erred as a matter of law is designed, according to the respondent, to "preserve the practitioner's ability to challenge the decision on this ground if, after review of the written record of proceedings and the applicable case law, there is a basis to file such a brief." (*Id.* at 28.) In fact, the respondent argues that filing an appeal that she knew "wholly lacked legal merit" would have been a violation of the professional rules of conduct. (*Id.* at 13.) The respondent asserts that a practitioner need only file a brief if she "identified errors and omissions giving rise to appealable issues after diligent review of the written transcript of proceedings which is delivered simultaneously with the briefing schedule." (*Id.* at 15) (internal quotation marks omitted). For the respondent, allowing for a case to be summarily dismissed is merely the inevitable result of a failure to file an appeal because it is "the appropriate procedural result after the practitioner scrutinized the record for errors and/or omissions and identified none." (*Id.* at 16.) Indeed, the respondent asserts, the "burden is not on the practitioner to withdraw the Notice [of Appeal] after review of the record because the Notice itself informs the practitioner that 'the Board *may* summarily dismiss'; no further action is required from the practitioner." (*Id.*) (emphasis in original).

These explanations do not excuse the respondent's conduct as it relates to the charge of frivolous behavior. The respondent was on notice that when the Board summarily dismisses an appeal she may have committed a violation of the professional code of conduct. *See* 8 C.F.R. § 1003.1(d)(2)(iii) (stating an appeal that is summarily dismissed by the Board "may constitute frivolous behavior under § 1003.102(j)"); *see also* BIA

---

[14] The respondent asserted that she discovered appealable issues in two cases, but did not file an appeal in either case. (Exh. 3 at 23-26 and 36-41.) In the first case, the respondent did not file an appeal because her client conceded the validity of new criminal charges and thus the respondent "decided it was not prudent to pursue the appeal." (*Id.* at 23-24; Exh. 2 at 100-01.) In the second case, the respondent identified appealable issues both at the merits hearing and after her review of the transcripts. (*Id.* at 37-38.) A brief was filed in the case, but it was untimely and the Board summarily dismissed the appeal. (*Id.* at 37-38; Exh. 2 at 162.) In any event, in neither case did the respondent file a timely brief or notify the Board as to why she failed to do so.

Practice Manual § 4.7(e) (October 5, 2020) (stating that if a practitioner states that an appeal will be filed on the Notice of Appeal, but the party "later decides not to file a brief, that party should notify the Board in writing *before* the date the brief is due") (emphasis in original). Moreover, the respondent's actions demonstrate that she understood that she should notify the Board if she did not wish to file an appeal. Twice the respondent filed a notice with the Board, albeit after the briefing deadline, that no appeal brief would be filed. (Ex. 2 at 15-18, 175-81; Exh. 3 at 6 and 41-42.) On cross examination, when the respondent was asked why she twice notified the Board that she would not file an appeal, but otherwise failed to provide such notice, she could not give an explanation for the difference in her actions.

The respondent's actions constitute frivolous behavior. She failed to take reasonable efforts to determine if there were any appealable issues before filing a Notice of Appeal in 10 of the 11 cases. At the time of the filings of the Notice of Appeal, on its face, the respondent's Notice of Appeal lacked merit because she had no idea whether the judge committed any error because she did not identify any issues until after she reviewed the transcripts in those cases. She made these claims without actually conducting any analysis of her client's cases.[15] Such conduct is in direct contravention of the requirement that all filings, including Notices of Appeal, must have an "arguable basis in law or fact" which is something the respondent knew or "reasonably should have known[.]" 8 C.F.R. §1003.102(j). Failing to make any reasonable effort, such as requesting a copy of the recorded hearings from the Immigration Court or reviewing the ROP at the Court, demonstrates that the respondent's Notice of Appeal in each of these cases was not "well-grounded in fact and [was not] warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law[.]" 8 C.F.R. § 1003.102(j)(1). Accordingly, the allegations in Counts 1-9 and 11 related to frivolous conduct are adopted and that same allegation in Count 10 is dismissed. 8 C.F.R. § 1003.106(b).

---

[15] The respondent stated that she found appealable issues in two cases (Counts 6 and 10), but she only identified appealable issues in one case (Count 10) before filing a Notice of Appeal with the Board. (Exh. 3 at 23-26 and 36-41.) Nevertheless, the respondent failed to timely file an appeal or notify the Board that she would not be filing an appeal related to the one case where she found appealable issues before filing the Notice of Appeal. (Exh 2 at 156-62; Exh. 3 at 37-38.) The respondent's conduct related to Count 6 amounts to frivolous behavior because she had not ascertained whether the Immigration Judge had erred before she filed the Notice of Appeal. As it relates to Count 10, this Court concludes that filing a Notice of Appeal was not frivolous because this Court credits the respondent's assertion that she found appealable issues prior to filing the Notice of Appeal. (Exh. 3 at 37.)

> b. *The Respondent's Conduct Constitutes Prejudice to the Administration of Justice or Undermines the Integrity of the Adjudicative Process as it Relates to Counts 1-11*

In her answer and before this Court, the respondent stated that her conduct related to Counts 1-11 was not prejudicial to the administration of justice nor did it undermine the integrity of the adjudicative process. In some cases, the respondent asserted that she did not file an appeal because she found no appealable issues, she discussed this conclusion with her clients, and notified them that their appeal would be summarily dismissed. (Exh. 3 at 6, 13-14, 31, 34-35.) The respondent also claimed in her answer that allowing a case to be summarily dismissed did not "seriously impair or interfere with the adjudicatory process; indeed, the process rendered the inevitable result given the fact that there simply was no basis to continue the appellate process." (*Id*. at 13.)

In one case, she filed a notice of appeal, reviewed the transcripts, and found no appealable issues. (*Id*. at 10.) She further discussed with her client the possible options and the consequences of those options. (*Id*.) Ultimately, the client decided to voluntarily depart the United States and the respondent documented this departure. (*Id*.) In two cases, the respondent filed a notice of appeal and identified potential appealable issues, but she could not locate the clients and thus did not file an appeal brief. (*Id*. at 17 and 21.) The respondent also identified appealable issues in another case after reviewing the transcripts and record, but the client committed a new criminal act and the respondent "decided it was not prudent to pursue the appeal." (*Id*. at 23-24.)

Count 10 relates to a case where two juveniles were placed in immigration proceedings. (*Id*. at 36.) The clients' applications for relief were denied and the respondent filed an appeal, reviewed the record, and identified a number of appealable issues, but the father of the clients decided that they would return to Mexico. (*Id*. at 37.) Based on these facts, the respondent stopped working on the appeal. (*Id*.) Later, the clients' father changed his mind and notified the respondent, but no attorney was available to continue the brief writing and thus the respondent filed a motion to reopen or reconsider a late filed brief with the Board. (*Id*.). Finally, in one case, counsel admits that the *pro bono* clinic did not properly calendar the deadline to file the brief. (*Id*. at 41.) A motion to extend the briefing deadline was granted and once counsel determined that no appeal would be filed, she untimely filed a notice with the Board that no brief would be filed. (*Id*.)

An overarching theme of the respondent's answer and testimony is that she must review the record and transcripts before she can make an informed decision on whether to appeal a case. (*Id*. at 28.) Indeed, as noted above, she asserts that the "statement 'the

Immigration Judge erred as a matter of law' simply preserves the practitioner's ability to challenge the decision on this ground if, after review of the written record of proceedings and the applicable case law, there is a basis to file such a brief." (*Id.*)

On Counts 1-11 the respondent's conduct prejudiced the administration of justice and undermined the integrity of the adjudicative process. The respondent has been a certified representative or practicing lawyer in Immigration Court for nearly forty-years dating back to the late 1970s. (Respondent's Affidavit in Support of Motion to Recuse at ¶ 4.) Her lengthy practice in Immigration Courts spans nine Presidents of the United States dating back to at least President Gerald Ford. Clearly, the respondent is an experienced immigration practitioner who is well aware of the interworking of the adjudicative process, the Immigration Courts, and the Board. *See* 73 Fed. Reg. 76914, 76918 (Dec. 18, 2008) (to be codified at 8 C.F.R. §§ 1001, 1003, and 1292) (explaining that 8 C.F.R. § 1003.102(n) "is based on ABA Model Rule 8.4(d)," and as such, "it is a well-known ethical rule with which most attorneys must comply whenever representing parties before a tribunal"). She is also aware of her obligation to ensure that appeals are not routinely summarily dismissed by virtue of the fact that the regulations warn practitioners that summary dismissal may result in a finding that the practitioner violated the professional code of conduct. *See* 8 C.F.R. § 1003.1(d)(2)(iii). She also knows that the Board encourages parties to notify the Board if a brief will not be filed. BIA Practice Manual at 4.7(e).

As noted above, the respondent did notify the Board on two occasions, albeit untimely, that she would not file an appeal. (Exh. 3 at 6, 41, and Exhibit D.) The respondent was questioned at her hearing about this inconsistent practice and she could not provide any explanation for why she sometimes filed a notice of withdrawal of her appeal and other times she did not. Finally, as the respondent admitted in her answer and to this Court, once a notice of appeal is filed, transcripts are created of every hearing before the Immigration Court, and the transcripts are sent to counsel.

Appeals to the Board must provide the appellate body with enough information to apprise it "of the issues on appeal so that the BIA is not left to search through the record and speculate on what possible errors" the alien claims were made by the Immigration Judge. *Singh v. Gonzales*, 416 F.3d 1006, 1010 (9th Cir. 2005) (citations omitted). In short, an alien must provide the Board with sufficient notice of the errors he claims were committed by the Immigration Judge in his case. An alien may "either meet the BIA's notice requirement by specifying the grounds for appeal in the notice of appeal or by filing a separate brief." *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 820 (9th Cir. 2003).

A notice of appeal must "inform the BIA of what aspects of the [Immigration Judge's] decision were allegedly incorrect and why." *Id*. at 1011 (citation omitted). Otherwise, the Board would be "forced to decipher general statements of error, unsupported by specific factual or legal references," and then the Board would need "to spend time and resources reconstructing the proceedings before" the Immigration Judge and build the alien's "legal case, in some instances only to conclude that the appeal was utterly without merit." *Id*. at 1010. On the other hand, when an appeal is specific and it provides "the reasons for an appeal, the BIA can deal promptly with appeals and focus resources on nonfrivolous appeals to reach a correct resolution." *Id*. In fact, "[f]rivolous and dilatory appeals are extremely wasteful of the Service's and [the] Board's limited resources." *Matter of Holguin*, 13 I&N Dec. 423, 424 (BIA 1969). Such appeals "require needless transcription of the records of deportation hearings. They impinge upon the time and professional attention needed for truly meritorious cases, of which they are many." *Id*. To ensure that the immigration laws are effectively administered, the Board is required to "discourage frivolous appeals." *Id*.

In the case before this Court, the respondent merely claimed legal error and that error would be further discussed in a brief filed with the Board. No brief was timely filed in any of the cases detailed in Counts 1-11 and this inaction seriously impaired or interfered with the adjudicative process because the Board had to spend time on an appeal, review the notice of appeal to determine if it was sufficiently detailed and draft an opinion summarily dismissing the appeal, all with a finite amount of resources and time. Had the Board received notice that an appeal would not be filed, that entire process would be short-circuited. Moreover, if the respondent acted diligently and reviewed the record and audio recordings at the Immigration Court, no transcript would be created and the respondent could have determined that there were no appealable issues in these cases before filing a notice of appeal. *See Irigoyen-Briones v. Holder*, 644 F.3d 943, 944 (9th Cir. 2011) (stating that counsel could not decide to take the respondent's case without first listening to the audio recordings of the proceedings, which he promptly did after being retained). The respondent's inaction of failing to notify the Board that she did not intend to file a brief impaired and interfered with the Board's adjudicative process by requiring it to spend time transcribing the proceedings and deciding on whether the notice of appeal was sufficient to issue a decision on the appeal or to summarily dismiss the appeal. *See Matter of Valencia*, 19 I&N Dec. 354, 355 (BIA 1986) (stating that it is "essential to the Board's adjudication of an appeal that the reasons given on the Notice of Appeal be as detailed as possible so that the alleged error can be identified and addressed.") Without specificity in a Notice of Appeal, "the Board can only guess at how the alien disagrees with the immigration judge's decision." *Id*. Despite the respondent's claim to the contrary, it was

her responsibility to notify the Board that she would not file a brief when she claimed she would do so. *See Matter of Lodge*, 19 I&N Dec. 500, 501 (BIA 1987) (stating that simply "indicating in a Notice of Appeal that oral argument is desired does not relieve the respondent for the responsibility for meaningfully informing the Board of the reason for the appeal"). As such, the allegation that the respondent violated Section 1003.102(n) in Counts 1-11 are adopted.[16]

### c. The Respondent Failed to Provide Competent Representation as it Relates to Counts 1-11

There has been no evidence presented to find that the respondent does not have the legal knowledge or skills necessary to reasonably represent her clients. The evidence does show, however, that the respondent lacked thoroughness and preparation in her handling of these cases detailed in Counts 1-11.

"The interrelated obligations of thoroughness and preparation require a lawyer to investigate all relevant facts and research applicable law." Ann. Model Rules of Pro. Conduct r. 1.1 annot. Investigation and Research (Am. Bar Ass'n 2019); *see also* 73 Fed. Reg. 76914, 76918 (explaining that because 8 C.F.R. § 1003.102(o) is "based on ABA Model Rule 1.1," relevant ABA comments concerning that rule are "an important aid in interpreting this disciplinary ground"). Absent an "inquiry into and analysis of" of the facts of a case, a practitioner can neither "apply [relevant rules and principles] to clients' circumstances," nor accurately assess the level of "attention and preparation" a case requires. *See* Ann. Model Rules of Pro. Conduct r. 1.1 cmt. 5.

Here, the respondent failed to analyze factual and legal issues prior to filing an appeal in 10 of the 11 instances listed in the NID. As noted above, prior to filing a Notice of Appeal, the respondent did not know whether she had a factual or legal basis to appeal clients' cases, other than the case listed in Count 10 of the NID. In many cases, she filed a notice of appeal only because her client asked her to do so and without conducting any independent research of her own. (Exh. 3 at 4, 8, 12, 20, 23, and 26-27.) To be sure, the time frame to research and analyze a case is limited, but the regulations make clear that "[c]ompetent handling of a particular matter includes inquiry into and analysis of the

---

[16] This conclusion is reached even though the respondent was aware of appealable issues in one case (Count 10) prior to filing the Notice of Appeal because the respondent never timely filed an appeal or notified the Board of her intent not to do so. As such, the Board still expended time and limited resources to summarily dismiss that appeal.

factual and legal elements" presented, and the respondent's extensive experience demonstrates that she was aware of those requirements. 8 C.F.R. § 1003.102(o).

In some cases, the respondent's clients either departed the United States on their own or the respondent facilitated their departure. (*Id.* at 9-10, and 19.) In none of these cases, however, did the respondent act competently because she failed to notify the Board of these intervening events, something a competent practitioner would do. *See Singh*, 416 F.3d at 1010; Ann. Model Rules of Pro. Conduct r. 1.1 annots. Procedure, Court Rules ("A lawyer is required to know and follow all applicable rules of procedure. [. . .] Violation of court rules may also constitute lack of competence . . . ."); *see also* 73 Fed. Reg. 76914, 76918 (noting that 8 C.F.R. § 1003.102(o) "provides sufficient information for practitioners to be on notice of their duty to represent their clients competently"). The respondent's experience also put her on notice of the complex and consequential nature of appeals in immigration proceedings—where an appeal is potentially a client's last chance to avoid deportation. *See* Ann. Model Rules of Pro. Conduct r. 1.1 cmt. 5 (explaining that "attention and preparation are determined in part by what is at stake" in a case, and matters of greater complexity and consequence "ordinarily require more extensive treatment"). Yet the respondent repeatedly filed Notices of Appeal "that did not meaningfully apprise the Board of the reasons for the appeal," and in such cases she failed to timely file appeal briefs or otherwise notify the Board about her inability to do so. (Exh. 1 at ¶¶ 13, 23, 35, 45, 57, 69, 79, 89, 101, 125.) Her handling of these cases reflects a lack of inquiry, analysis, and preparation, which amounts to a failure to provide competent representation to her clients. 8 C.F.R. § 1003.102(o). Accordingly, the allegations in Counts 1-11 related to competent representation are adopted.

### d. The Respondent Failed to Act with Reasonable Diligence and Promptness in Representing Her Clients as it Relates to Counts 1-11

As noted above, the respondent did not timely file a brief in any of the cases listed in Counts 1-11 in the NID. In each instance, the respondent also did not timely notify the Board that she was withdrawing her client's appeal or would not file a brief. (Exh. 3 at 4-43.) In two instances (Counts 1 and 10), the respondent notified the Board that she would not file an appeal, but that notification was untimely. (*Id.* at 6 and 37-38.) The respondent repeatedly flouted the Board's briefing schedule and deadlines by asserting that she could not determine whether appealable issues existed before filing a Notice of Appeal. She further repeatedly failed to notify the Board that she would not file an appeal by claiming that such a process is contemplated by Board's regulations regarding summary dismissal.

The respondent's arguments are unconvincing. A practitioner is obligated to act with reasonable promptness, which means, at a minimum, she must comply "with all time and filing limitations." 8 C.F.R. § 1003.102(q)(2). These time and filing limitations requires that a practitioner notify the Board if she will not file a brief when she asserted she would in her Notice of Appeal. To find otherwise would mean that practitioner could file Notices of Appeal without conducting any analysis of their clients' case and leave it to the Board to eventually summarily dismiss their appeals. Such a practice is not contemplated by the rules of professional conduct. *See, e.g.*, Ann. Model Rules of Pro. Conduct r. 1.3 annots. Taking No Action, Failure to Complete Work (Am. Bar Ass'n 2019) (explaining that ABA Model Rule 1.3 "imposes a duty to carry through to conclusion all matters related to the representation, unless the lawyer withdraws," and noting that "a lawyer who takes no action on a case is subject to discipline under Rule 1.3"). Indeed, on at least two occasions, albeit untimely, the respondent notified the Board that she would not be filing a brief because she had previously filed a request to extend the briefing deadline. Clearly, the respondent knew that at least for some cases, it is proper practice to notify the Board that she would not be filing a brief. Her failure to do so in a timely manner in all cases demonstrates that she failed to competently represent her clients because she did not act "with reasonable diligence and promptness in representing" her clients. 8 C.F.R. § 1003.102(q). This Court, therefore, concludes that the allegations in Counts 1-11 related to competent representation are adopted.

2.  Counts 12-16 and Count 19

In Counts 12-16 and Count 19, the government alleges that the respondent failed to file court-ordered briefs by court imposed deadlines. The respondent does not contest these allegations, but rather states that she was unable to file briefs because the *pro bono* clinic was not equipped to do so or that briefs were unnecessary because the judge had all of the information he needed to decide the cases before him.

> a.  *The Respondent's Conduct was Prejudicial to the Administration of Justice and Undermined the Integrity of the Adjudicative Process as it Relates to Counts 12-16 and Count 19*

The respondent failed to file court-ordered briefs by court imposed deadlines in six cases detailed in Counts 12-16 and Count 19 of the NID. (Exh. 1 at 15-24 and 26-30.) In each case, Judge Keenan scheduled an individual hearing and provided the respondent with a briefing deadline to outline the clients' eligibility for relief. In each instance, either the respondent, or counsel appearing on behalf of the respondent, accepted the deadline issued by the Court without hesitation or a request for additional time.

The respondent gave a number of reasons for why she failed to file a brief as ordered by Judge Keenan. To Judge Keenan, the respondent claimed that she thought a brief was filed by "someone else," that the file was "inadvertently archived," that the application tells the story, implying that a brief was unnecessary, that the clinic was not organized in a way to file briefs, or that the respondent believed "the hearing would be continued because" her client "had an appeal pending in his criminal case." (Exh. 1 at 15-16, 19-21, and 27.)

In her answer, the respondent discussed each count in the NID separately. As it relates to Count 12, she stated that normally Immigration Judges do not require briefs to be filed and that Judge Keenan "is the only Judge in the courts Clinic lawyers practice who requests a 42b brief." (Exh. 3 at 44.) While the respondent stated she was not suggesting that a judge's orders should be ignored, she implied that the requirement to file a brief was unnecessary because the contents of the application and the testimony of the alien should be sufficient given that the law does not change much as it relates to cancellation of removal for certain nonpermanent residents. (*Id.*) She further argued that because this Court's *Operating Policies and Procedures Memorandum* 08-01 states that it "is incumbent on every Judge to facilitate *pro bono* representation[]" Judge Keenan should not have treated the respondent with "hostility and communicate through clearly confrontational interrogation[.]" (*Id.* at 47.) She also stated that because the DHS did not file a brief this Court should give no weight to this complaint and it should be dismissed.[17] (*Id.*)

The respondent reiterated the same arguments in her answer related to Counts 12-16 and Count 19, as she did regarding Counts 12, namely that the judge had all of the information necessary to make a decision without the ordered brief. (*Id.* at 49.) She asserted that the result of the case had nothing to do with whether a brief was filed, but rather a disagreement regarding the level of hardship the client's United States citizen children would suffer if the client were removed. (*Id.*) In two cases, the respondent was unable to file a brief because she could not locate her client, but, as she admitted during her testimony before this Court, she did not notify Judge Keenan of her failure to locate

---

[17] In the respondent's answer and through counsel at the disciplinary hearing, the respondent argues that the government failed to submit a brief as ordered by Judge Keenan. (Exh. 3 at 47-48, and 53.) As such, the respondent claims, this Court should not issue any disciplinary sanction against the respondent if none will be leveled against the DHS attorneys. This argument is not persuasive. First, this Court has no authority to issue disciplinary sanctions against a party that is not before it. Second, this Court has no jurisdiction to issue disciplinary sanctions against DHS attorneys. 8 C.F.R. § 1003.101(b). Finally, the respondent's conduct is not excused assuming that there is a colorable claim regarding the asserted shortcomings of DHS counsel in the cases cited by the respondent.

her client. (*See id.* at 51 and 56.)   In another instance, the respondent admitted that the *pro bono* clinic only had the capacity to prepare applications for relief, provide lawyers "to advise and prepare clients for hearings, to appear at master calendar hearings and present the case at the merit hearing[.]" (*Id.* at 53.)  The clinic did not, however, "have capacity to produce a pre-trial brief." (*Id.*)

The government has met its burden to demonstrate that the respondent's failure to file Court ordered briefs as detailed in Counts 12-16 and Count 19 was prejudicial to the administration of justice and undermined the integrity of the adjudicative process.  The respondent's statements in her answer and testimony before this Court does not change the Court's conclusion.  In both her answer and testimony before this Court, the respondent time and again asserted that the administration of justice was not undermined nor was the integrity of the adjudicative process affected because the judge had all of the information he needed to make a decision.  The respondent's statements clearly indicate to this Court that she does not fully appreciate the impact her actions had on the adjudicative process. *See also* Ann. Model Rules of Pro. Conduct r. 8.4 annot. Intent Not an Element ("A lawyer need not have intended to prejudice the administration of justice to violate the rule.") (citing *In re Alexander*, 300 P.3d 536 (Ariz. 2013) (explaining that because conduct prejudicial to the administration of justice requires no mental state other than negligence, a lawyer's motives for engaging in such conduct are immaterial)).

As the respondent admitted to this Court, a well-drafted brief could make an enormous difference in whether a judge grants relief or not.  An alien may not be able to persuasively articulate the hardship to his qualifying relative, but a cogent, well-written brief could persuade a judge that he should grant relief from removal.  And the respondent admitted as much before this Court.  In any event, the respondent should have reasonably known that failing to write a brief as ordered by the Court would seriously impair or interfere with the judge's ability to adjudicate an alien's case fairly and efficiently. *See* Ann. Model Rules of Pro. Conduct r. 8.4 annot. Abusive or Disruptive Behavior ("Conduct that is abusive or disruptive or that impedes the proper functioning of the legal system can violate Rule 8.4(d)."). As Judge Keenan stated in his testimony before this Court, failing to file a brief delays cases and slows down hearings because a brief can identify and narrow issues in a case.  This testimony demonstrates and the respondent's admission shows that a brief can be the ultimate persuasive tool to convince a judge to grant relief, and a failure to file a brief impairs and interferes with the judge's ability to adjudicate the cases before him. *See* 8 C.F.R. § 1003.102(n) (stating that "any action or inaction that seriously impairs or interferes with the adjudicative process when the practitioner should have reasonably known to avoid such conduct" amounts to prejudice to the administration of justice and

undermines the integrity of the adjudicative process). Consequently, this Court concludes that the respondent's conduct was prejudicial to the administration of justice and undermined the integrity of the adjudicative process as detailed in Counts 12-16 and Count 19 in the NID. As such, those allegations are adopted.

> ### b. *The Respondent Failed to Competently Represent as Detailed in Counts 12-16 and Count 19*

The government has demonstrated that the respondent's failure to abide by court imposed deadlines amounts to a failure to provide competent representation. Competency requires, among other things, preparation as is reasonably necessary to represent a client. 8 C.F.R. § 1003.106(o). Failure to timely file court ordered briefs goes to the heart of competent representation. It matters not that the respondent may believe that a brief would be unhelpful to the judge. Instead, a competent practitioner ensures that she timely files all documents, including briefs, by court imposed deadlines. *See id.* This is particularly important in cases where an alien may not be able to persuasively articulate the reasons why relief should be granted. As the respondent admitted to this Court, a well-written and argued brief can persuade a judge to grant relief. But the respondent did not do that. Instead, she repeatedly ignored deadlines and was, at a minimum, not reasonably prepared for the merits hearing in each of the cases detailed in Counts 12-16 and Counts 19 of the NID. This lack of preparation demonstrates that the respondent did not competently represent her clients because she failed to inquire into and analyze "the factual and legal elements of the problem, and use . . . methods and procedures" to meet the standards of a competent practitioner. *Id.* Accordingly, this Court adopts the allegation that the respondent failed to competently represent her clients as discussed in Counts 12-16 and Counts 19 of the NID.

> ### c. *The Respondent Failed to Act with Reasonable Diligence and Promptness as it Relates to Counts 12-16 and Count 19*

The respondent's conduct in Counts 12-16 and Count 19 also demonstrate that she did not act with reasonable diligence and promptness. The respondent admitted in her answer and to this Court that she did not file a brief in any of the cases cited in the NID. Sometimes her workload or lack of staff caused her failure to file briefs, and other times it appears that she simply ignored the deadline because she did not believe a brief was necessary. *See* Ann. Model Rules of Pro. Conduct r. 1.3 annot. Lawyer Not Relieved of Ethical Obligation by Delegating Work ("A lawyer who agrees to represent a client is not relieved of ethical obligations by delegating the work to others."). Whatever the reason, her conduct constitutes a failure to be reasonably diligent and prompt in representing her

clients because she failed to manage her workload such that she could comply with court imposed deadlines and "all time and filing limitations." 8 C.F.R. §§ 1003.102(q)(1) and (2); *see also* Ann. Model Rules of Pro. Conduct r. 1.3 cmt. 2 (explaining that in order to act with reasonable diligence and promptness in representing a client, "[a] lawyer's work load must be controlled so that each matter can be handled competently"). Consequently, this Court adopts the allegations that the respondent failed to act with reasonably diligence and promptness related to Counts 12-16 and Count 19 in the NID.

### 3. Counts 17-18 and Counts 20-24

In Counts 17-18 and Counts 20-24, the government alleges that the respondent failed to file applications for relief or ensure that her clients completed biometrics requirements by court imposed deadlines. The respondent does not contest that she failed to file applications or that biometrics were not completed, rather she provides explanations for her failure to comply with court ordered deadlines.

> *a. The Respondent's Conduct was Prejudicial to the Administration of Justice and Undermined the Integrity of the Adjudicative Process as it Relates to Counts 17-18 and Counts 20-24*

As it relates to Count 17, the respondent stated in her answer that her client failed to provide the necessary documents to timely file her application for relief. (Exh. 3 at 60-61.) At the master hearing before Judge Keenan, the respondent sought additional time to prepare the applications for relief, but the request was denied. (*Id*. at 61.) The respondent's actions caused prejudice to the administration of justice and undermined the integrity of the adjudicative process because she took no steps to rectify her client's alleged failure. For instance, the respondent did not request additional time to prepare her client's application before the hearing. Instead, she appeared at the hearing and sought additional time to file her application, even though she knew that a failure to file the application could result in the judge deeming the applications abandoned. (Exh. 2 at 423.)

The respondent provided the same explanation for her failure to file an application for her client as detailed in Count 18 of the NID. (Exh. 2 at 64.) But, as Judge Keenan stated, the respondent "had a duty to comply with the court-ordered filing deadline or, in the alternative, provide a timely explanation about why she was unable to meet the deadline." (*Id*. at 65.) Moreover, as the respondent admitted to this Court at her disciplinary hearing, immigration courts are overburdened with cases, and if every alien sought to continue his case for the filing of applications because the alien failed to timely file them, it would severely impact the court's operations and ability to adjudicate cases.

This admission alone demonstrates that the respondent's failure to timely file applications was prejudicial to the administration of justice. The respondent's admission is not the sole evidence to demonstrate prejudice to the administration of justice, however. Prior to the hearing, the respondent neither notified the Court nor sought a continuance for additional time to submit her client's applications for relief. Instead, she waited until the hearing to request a continuance despite being on notice of a court-ordered deadline. On its face, this conduct "seriously impairs or interferes with the adjudicative process" because a failure to file an applications on behalf of a client significantly impedes a judge's ability to expeditiously adjudicate the case, which in turn hampers the judge's ability to hear other cases on his docket.

Similarly, the respondent's conduct for the remaining counts (20-23) was proven by the government by clear and convincing evidence. The respondent's failure to file an application in those cases impaired and interfered with the court's ability to adjudicate cases. Without an application, a judge cannot schedule the case for an individual hearing, and by failing to notify the court prior to the hearing that no application would be filed, the judge could not schedule another case that may have been ready to proceed to an individual hearing. The respondent's explanations in her answer and testimony do not change this Court's findings. Like with Count 17, the respondent blamed her clients for failing to maintain contact with her so that she could timely submit their applications to the court and thus she asserted that she could not comply with the Court's order. (Exh. 3 at 64-65, 74-75.) As noted above, this explanation does not save the respondent from the prejudicial effects her inaction had on the adjudicative process. Had the respondent notified the court of her uncooperative client, she would have had a stronger case for this Court to find that the government had not met its burden. Rather than notify the court of her uncooperative client, the respondent said nothing and sought additional time to file an application when she was given ample opportunity to do so.

In her answer, the respondent explained that her client's failure to file his application as detailed in Count 23 was because he could not pay the application or biometrics fees. The respondent asserts that her client could not file his application without the filing fee because the instructions on the application for relief require a fee receipt for the court to accept the application. (*Id.* at 81.) In this case, biometrics were also not completed as required by the merits hearing. (*Id.* 82.) Ultimately, the respondent blamed the government because it did not run the respondent's fingerprints that it had based on the client's arrest in conjunction with his immigration case. (*Id.*) She also attempts to deflect from her failure to timely obtain biometrics by stating that her client could not afford the fees. Finally, she made a bold assertion that no "interest of the Immigration Court nor the

United States is harmed by accepting the 42b application, albeit 23 days after the due date, given the" families inability to pay the filing fees. (*Id*.) These explanations do not excuse the respondent's conduct and do not take her conduct outside the ambit of the professional code of conduct for a number of reasons.

At the outset, it should be noted that an Immigration Judge cannot grant relief from removal without biometrics clearance. *See* 8 C.F.R. § 1003.47(g) (stating that in "no case shall an immigration judge grant an application for immigration relief that is subject to" biometrics) Without completed and cleared biometrics, the alien cannot demonstrate whether he is eligible for the relief that he seeks because some forms of relief are barred depending on the character of a prior conviction. *See* INA §§ 240A(a)(3) (stating that a lawful permanent resident cannot cancel his removal if he is an aggravated felon), 240A(b)(1)(B)(C) (stating that an alien cannot obtain cancellation of removal if he has been convicted of an aggravated felony, crime involving moral turpitude, or a controlled substance offense), 208(b)(2)(B)(i) (stating that an alien may not be granted asylum if he committed a particularly serious crime), and 241(b)(3)((B)(ii) (same). Effectively, a lack of biometrics means that a judge is left with a few options. The judge may grant a continuance so that biometrics can be completed, he can bifurcate the hearing and take some testimony and then continue the case so that biometrics can be completed, or he can find an application abandoned.[18] The first two options would delay an alien's case and negatively effect the administration of the adjudicative process because, as the respondent admitted, cases are scheduled months if not years in advance. In addition, there is no resolution for the respondent before the Court because biometrics were not completed. Finally, the respondent's speculation that there is no prejudice to the Court or government for filing the respondent's application 23 days late misses the point.

An Immigration Judge is obligated to timely and expeditiously resolve removal proceedings. 8 C.F.R. §§ 1003.10(b) and 1003.12. Both the Act and the regulations governing Immigration Courts reflect "Congress's intent to streamline the deportation process." *Matter of L-A-B-R-*, 27 I&N Dec. 405, 406 (A.G. 2018). Indeed, the "United States has a strong interest in the orderly and expeditious management of immigration cases." *Id*. (citing *Alsamhouri v. Gonzales*, 484 F.3d 117, 123 (1st Cir. 2007) (internal quotation marks omitted)). Granting a continuance can be an "efficient management tool for adjudicators and 'promote efficient case management.'" *Id*. (citing *United States v. Tanner*, 544 F.3d 793, 795 (7th Cir. 2008)). "But continuances are also 'readily susceptible

---

[18] The grant of a continuance for a failure to obtain biometrics must be based on good cause shown. 8 C.F.R. § 1003.47(c). None of the explanations provided by the respondent demonstrate good cause for failing to obtain biometrics.

to use as a delaying tactic.'" *Id.* (citing *Lee v. Kemma*, 534 U.S. 632, 366 (2002)). Failing to file applications for relief or the untimely filing of relief, and the resulting continuance that may follow "imposes no small burden on the immigration court—a burden that, as in ordinary litigation, 'counsels against continuances except for compelling reasons.'" *Id.* (citing *Morris v. Slappy*, 464 U.S. 1, 11 (1983)). This is particularly true in the immigration context as the United States Supreme Court has observed, "[o]ne illegally present in the United States who wishes to remain . . . has a substantial incentive to prolong litigation in order to delay physical deportation for as long as possible." *Id.* (citing *INS v. Rios-Pindeda* 471 U.S. 444, 450 (1985)).

Granting continuances indiscriminately for an alien's failure to timely file an application or complete biometrics adds to the Immigration Court backlog and does not expeditiously resolve cases. Moreover, if judges were to continue every case for aliens' failure to file applications for relief or complete biometrics, few cases would reach a timely resolution. Here, the respondent's actions exacerbated existing backlogs and negatively affected the administration of the adjudicative process by unnecessarily delaying it. *See* 8 C.F.R. § 1003.102(n) (stating that "any action or inaction that seriously impairs or interferes with the adjudicative process" is prejudicial to the administration of justice or undermines the integrity of the adjudicative process).

Nonetheless, the respondent had another option to ensure that she did not negatively affect the administration of the adjudicative process—she could have sought to waive the filing fee and biometrics fees that her clients apparently could not afford. *See* 8 C.F.R. 8 C.F.R. § 1003.24(d) (granting Immigration Judges the authority to waive filing fees for applications for relief). She did not do this. Instead, she claimed that an Immigration Judge does not have the authority to waive biometrics fees. While this is true, the government could certainly do so.[19] 8 C.F.R. § 103.7(c)(3)(i).

The respondent's explanation for her conduct as it relates to Count 20 was slightly different. In that case, the respondent was given a deadline by which to file an adjustment of status application and a family-based petition (Form I-130). (Exh. 1 at 30 ¶ 222-23.) The respondent failed to do so. (*Id.* at ¶ 223.) Over the DHS's objection, Judge Keenan granted the respondent's request for additional time and she was required to provide proof

---

[19] At her disciplinary hearing, the respondent stated she was unaware that the government could waive biometrics fees. This admission is surprising given the respondent's extensive experience in immigration proceedings. It does not, however, change the fact that the respondent could have avoided her failure to file applications and obtain biometrics based on her client's inability to pay the fees by seeking a waiver for each fee.

of the filing at the next hearing. (*Id.* at 30-31 ¶ 224.) At the next hearing, no proof of filing was provided to the court, and counsel who appeared stated that he was unaware that proof of filing was required.[20] (*Id.* at 31 ¶ 227.) Once again, Judge Keenan granted a continuance to provide proof that the application was filed. (*Id.* at ¶ 231.) A number of additional hearings were held and a number of excuses were given for failing to provide a fee receipt, including that the application was rejected because the wrong fee was submitted. (*Id.* at 31-32 ¶¶ 233-34.) Each time, over the DHS's objection, Judge Keenan granted a continuance. (*Id.* at 32 ¶¶ 235-38 and 241.)

The respondent's answer stated that ultimately the applications were filed but because her clients moved while the applications were pending, they did not receive the fee receipt. (Exh. 3 at 72.) She asserted that she is aware of the need to "move matters along, however, in cases where there is no dispute raised regarding eligibility for relief, it would seem, as a matter of public interest, appropriate to permit the parties the time necessary to produce the required documentation to permit the Court to favorably act." (*Id.*) For the respondent, this is particularly true in the context of *pro bono* representation who are "community volunteers" acting as "friend of the Court, working with families to prepare the required forms and collect the required documentation." (*Id.* at 72-73.)

The respondent's conduct and her explanation in her answer as it relates to Count 20 only illuminates this Court's point regarding the effect a failure to abide by court imposed deadlines has on the adjudicative process. The case was continued five times to provide proof that the application and family-based petition was filed. (Exh. 1 at 30-31 ¶¶ 224, 228, 232, 235, 241.) These continuances spanned over 18 months—from May 2, 2017, until November 13, 2018.[21] (*Id.*) Such delays required hearing time, the court's preparation, and other hearings could not be heard due to the respondent's inability to abide by court-imposed deadlines. *See Matter of L-A-B-R-*, 27 I&N Dec. at 406 (stating that continuances "impose no small burden on the immigration court") In the end, this Court adopts the allegations that the respondent's failure to abide by court imposed deadlines related to Counts 17-18 and Counts 20-24 in the NID and finds they have been proven by clear and convincing evidence.

---

[20] The respondent did not appear at this hearing.

[21] It appears that some of the delay was based on the court rescheduling the case on its own. (Exh. 1 at 31-32 ¶¶ 225 and 229.) These delays do not take away from the fact that the respondent was largely responsible for the delays in her client's case and those delays negatively impacted the adjudicative process.

   b. *The Respondent Failed to Provide Competent Representation and Reasonable Promptness as it Relates to Counts 17-18 and Counts 20-24*

  The government alleged that the respondent's conduct as detailed in Counts 17-18 and Counts 20-24 demonstrate that she failed to competently represent her clients. The respondent disagreed, arguing in her answer as noted above, that her clients failed to provide her with the required information or they did not have the funds to pay the filing fees.

  The respondent's conduct fell short of her duty to competently represent her clients. In the cases where the respondent failed to file an application for relief, the judge found the applications abandoned and ordered the respondent's clients removed or granted voluntary departure.[22] (Exh. 1 at 25-26, 30-40 ¶¶ 176, 190, 253, 265, 273, 284.) In one case where biometrics were not completed, the client was granted voluntary departure. (*Id.* at 35-36 ¶¶ 264-265.) The respondent's actions lacked thoroughness and she was not prepared as was reasonably necessary for these cases. Her conduct also lacked reasonable diligence because she failed to act with reasonable promptness and repeatedly did not comply with court imposed deadlines as required by the applicable regulations. *See* 8 C.F.R. § 1003.102(o) (stating competent representation required thoroughness and "preparation reasonably necessary for the representation"); 8 C.F.R. § 1003.102(q) (stating that reasonable diligence and promptness requires a practitioner to act "with reasonable promptness" and to comply with "timing and filing limitations"). She did not seek a waiver of filing fees for cases in which the client could not afford the application fee or the biometrics fee. In fact, she claimed in her testimony before this Court, that she was not even aware that biometrics fees could be waived. Instead of doing any of these things, the respondent sought additional time rather than resolving her clients' financial obstacle by obtaining a waiver of fees. In cases where her clients were uncooperative, the respondent did not seek to continue the hearing prior to the scheduled hearing date to try and resolve the client's cooperation.

  The respondent's conduct related to Count 17 illustrates this Court's findings as it relates to the allegations that the respondent failed to competently represent her clients or to act with reasonable diligence. In that case, the respondent failed to timely file an application for relief. (Exh. 1 at 24-25 ¶¶ 171-76.) Judge Keenan ordered the respondent's

---

  [22] The client in Count 20 was not ordered removed nor was voluntary departure granted. It appears that the case is still pending the adjudication of the family-based petition. (Exh. 1 at 32 ¶ 241.)

client removed, finding her applications for relief abandoned because she failed to timely file them. (*Id.*) According to Judge Keenan's testimony, the alien was a lawful permanent resident and was seeking to maintain such status through cancellation of removal. After the removal order was issued, the alien hired new counsel and filed a motion to reopen, claiming ineffective assistance of counsel by the respondent. (*Id.* at 25 ¶ 177.) Judge Keenan granted the motion (*Id.* at ¶ 178) and according to his testimony ultimately granted the alien's relief from removal. The respondent's inaction in this case resulted in a severe consequence to her client—a removal order. "Deportation can be the equivalent of banishment or exile." *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) (citation omitted). As such, the "stakes are indeed high and momentous" especially for an "alien who has acquired [her] residence" in the United States. *Id.* Despite these dire consequences, the respondent failed to abide by her obligations to timely file the alien's application for relief, which initially resulted in her removal. While the respondent claims that her client did not cooperate with her to file her relief application (Exh. 3 at 60-61), the record demonstrates that she was indeed ineffective and it was her failure to act in accordance with the rules of professional conduct that resulted in her client's removal order. (Exh. 1 at 25 ¶¶ 177-78; Exh. 3 at 424-25, 428-37.) Accordingly, this Court adopts the allegations detailed in Counts 17-18 and Counts 20-24 in the NID.

## V. DISCIPLINARY SANCTIONS

Once an adjudicating official finds that a practitioner has violated the rules of professional conduct, it must decide whether to impose disciplinary sanctions. 8 C.F.R. § 1003.101(a). Disciplinary sanctions may be imposed "against any practitioner" if the adjudicating official "finds it to be in the public interest." *Id.* An adjudicating official may disbar a practitioner from the "practice before the Board and the Immigration Courts or the DHS, or before all three authorities[.]" 8 C.F.R. § 1003.101(a)(1). A practitioner may be "suspended, including immediate suspension," from any of the above three listed authorities. 8 C.F.R. § 1003.101(a)(2). An adjudicating official may issue a "[p]ublic or private censor" or any "other disciplinary sanctions as the adjudicating official or the Board deem appropriate." 8 C.F.R. §§ 1003.101(a)(3) and (a)(4). Practitioners and accredited representatives are subject to disciplinary sanctions, but attorneys who represent the federal government are not subject to the professional code of conduct in the regulations at issue in this case. 8 C.F.R. § 1003.101(b).

The regulations do not define when it is in the public interest to sanction a practitioner. Disciplinary sanctions, however, must be imposed if a practitioner "engaged in criminal, unethical, or unprofessional conduct, or frivolous behavior" as defined in the regulations. 8 C.F.R. § 1003.101(a). There is no guidance in the regulations regarding the

type or length of sanction that should be imposed, even in circumstances that mandate a sanction. This Court, therefore, looks to Arizona disciplinary cases and the American Bar Association (ABA) as instructive and persuasive authority in determining whether to impose sanctions and the appropriate sanction to impose.

The purpose of disciplinary sanctions is "to protect the public, the legal profession, and the legal system and deter other attorneys from engaging in unprofessional conduct." *In re Non-Member of State Bar of Arizona Van Dox*, 214 Ariz. 300, 303 (2007) (*en banc*). Disciplinary sanctions are also designed to "instill public confidence" in the state bar's integrity. *In re Abrams*, 227 Ariz. 248, 252 (2011). Sanctions are not intended to punish the practitioner, although that may be the incidental effect. *In re Van Dox*, 214 Ariz. at 303. The ABA suggests that disciplinary authorities should consider four factors when imposing an appropriate sanction—"(1) the duty violated, (2) the lawyer's mental state, (3) the actual or potential injury caused by the lawyer's misconduct, and (4) the existence of aggravating or mitigating circumstances." *Id*. (citing *ABA Standards*, Standard 3.0).

A reprimand "is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client." *Id*. (citing *ABA Standards*, Standard 4.13). Such a sanction, however, is usually only fitting "when a lawyer engages in an isolated instance of negligence in determining whether he or she is competent to handle a legal matter, and causes little or no actual or potential injury to a client." *Id*. (citing *ABA Standards*, Standard 4.54).

### A. Disciplinary Sanctions are Appropriate in this Case

The regulations require some form of disciplinary sanctions given this Court's finding that the respondent behavior was frivolous. In particular, as noted above, this Court concluded that the respondent engaged in frivolous behavior as detailed in Counts 1-9 and Count 11. Based on these findings alone, this Court is obligated to issue some disciplinary sanction. 8 C.F.R. § 1003.101(a). Even if this Court did not find that the respondent engaged in frivolous behavior, however, the totality of the respondent's conduct as discussed in detail above, compels the conclusion that some form of disciplinary sanction is necessary. In summary, the respondent engaged in a pattern and practice of misconduct, including failing to provide specific grounds for appeals in ten cases after affirmatively stating an intent do so in the Notice of Appeal, failure to file court-ordered briefs in six cases, and failure to file applications for relief or complete biometrics by court imposed deadline in seven cases. This conduct demonstrates that it is in the public interest to sanction the respondent. Her conduct gives little confidence to the public that it will be well-served when a practitioner behaves frivolously, repeatedly fails to file appellate briefs

despite stating that she will do so, repeatedly fails to file briefs when ordered to do so, fails to file applications for relief, and fails to ensure biometrics are completed prior to a merits hearing. This conduct also enormously affects the adjudicative process. Immigration Judges and the Board cannot efficiently resolve cases when a practitioner routinely ignores court orders and deadlines. The immigration court system has a substantial backlog of cases and the respondent's conduct helped exacerbate the backlog. And in at least one case, as related in Count 17 of the NID, the respondent's client was ordered removed even though she eventually was able to maintain her lawful permanent resident status because the judge reopened her case based on an allegation of ineffective assistance of counsel by the respondent.

## B. The Four ABA Factors

As noted above, when determining an appropriate sanction, this Court is to consider a number of factors. *In re Van Dox*, 214 Ariz. at 303. Those factors are "(1) the duty violated, (2) the lawyer's mental state, (3) the actual or potential injury caused by the lawyer's misconduct, and (4) the existence of aggravating or mitigating circumstances." *Id.* (citing *ABA Standards*, Standard 3.0). These factors and their application to the respondent's case are discussed in detail below.

### 1. The Duty Violated

In this case, the duty the respondent violated is core to her responsibility as counsel of record. As detailed above, the respondent violated a number of duties related to her professional responsibility before the Immigration Courts and the Board. *See* 8 C.F.R. §§ 1003.102(j) (frivolous behavior); (2) 8 C.F.R. § 1002.102(n) (conduct prejudicial to the administration of justice); (3) 8 C.F.R. § 1002(o) (competence); and (4) 8 C.F.R. § 1003.102(q) (diligence and promptness). A practitioner is obligated to ensure she prepares an appeal prior to filing a Notice of Appeal. This is because by filing such a notice, the practitioner is stating that there is an "arguable basis in law or fact" which is something the respondent knew or "reasonably should have known[.]" 8 C.F.R. § 1003.102(j). Moreover, she failed to make any reasonable effort, including seeking a copy of the recording of the hearing from the Immigration Court or reviewing the ROP at the Court, for Counts 1-9 and Count 11. As such, she could not demonstrate that the appeal was "well-grounded in fact and [was] warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law[.]" 8 C.F.R. § 1003.102(j)(1). At a minimum, once the respondent realized that there were no appealable issues, she should have sought to withdraw the appeal she filed with the Board. She did not do that. Instead, she merely waited for the Board to summarily dismiss the appeal, which makes a

mockery of the appellate process. Just as it would be egregious to routinely ignore appeals filed before a state or federal appellate body, it was egregious for the respondent to make it her practice to routinely ignore warnings and deadlines from the Board.

Not only did this conduct amount to frivolous behavior, but it also affected the administration of justice and undermined the integrity of the adjudicative process by requiring the Board to decipher the basis of the appeal, requiring it to expend time and resources on an appeal that may ultimately be "utterly without merit." *Singh*, 416 F.3d at 1010. Moreover, the respondent failed to competently represent her clients because she did not analyze their cases before filing a Notice of Appeal as required by the regulations. *See* 8 C.F.R. § 1003.102(o) (stating that representation requires thoroughness and preparation "reasonably necessary for the representation[] and that a practitioner must inquire and analyze "the factual and legal elements of the problem").

Ultimately, disciplinary sanctions are appropriate because the respondent violated her ethical duties when appearing before the Immigration Courts and the Board. She failed to follow proper procedures related to appeals to the Board, she repeatedly failed to follow court imposed deadlines, and as a result many of her clients were removed from the United States. Her failure to abide by court imposed deadlines strikes at the heart of the adversarial process. "Removal proceedings, which are adversarial in nature, are designed to provide the parties with an opportunity to develop the record by presenting evidence and testimony before an Immigration Judge[.]" *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 190 (BIA 2018). It is only then that a judge can make "the necessary factual findings and legal conclusions based on the claims presented." *Id*. at 190-91. An applicant for relief bears the "burden to establish her claim for relief or protection on the record before the Immigration Judge." *Id*. at 191. The respondent's failure to file applications for relief, briefs, or completing biometrics goes to the heart of an Immigration Judge's duty to adjudicate relief from removal. Without the benefit of evidence and testimony, a judge cannot decide whether an alien will remain in the United States or be removed. The respondent's failure to follow court ordered requirements undermined and slowed the entire administrative process and was a clear violation of her duty to the court. In no other adversarial or judicial setting would this behavior be acceptable.

## 2. The Practitioner's Mental State

A practitioner's "mental state affects the sanction for ethical violations." *In re Dox*, 214 Ariz. at 303. "Intentional or knowing conduct threatens more harm to the public, the legal system, and the profession than does negligent conduct, and is accordingly sanctioned more severely." *Id*. (citing ABA *Standards* at 9-10.) This Court is also required to

determine the injury caused by the respondent's actions. *In re Abrams*, 227 Ariz. at 251-52 (citation omitted). Injury is defined as "the harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." *Id.* (citation omitted). Some of the conduct discussed above appears to be reckless, but most of it is an intentional and knowing disregard by the respondent of her duty as a practitioner and her obligation to comply with court ordered deadlines.

The respondent's mental state is telling regarding her true attitude toward her own misconduct. In nearly each instance, the respondent blamed others or the regulations for her conduct rather than taking responsibility for her actions. As it relates to counts failing to file appellate briefs, the respondent stated that it was her practice to file a Notice of Appeal before analyzing the respondent's case for possible appealable issues. In the notice, the respondent would vaguely claim that the judge committed error as a matter of law. This notice was insufficient to apprise the Board of the basis for the respondent's appeal and demonstrates an utter lack of preparation by the respondent as she was obligated to do. As noted above, the deadline to file a Notice of Appeal is short, but that is the time frame the Agency set to file an appeal. Filing a Notice of Appeal is not like filing a Notice of Intent to Appeal, where a litigant is merely preserving his or her right to appeal. *Compare* EOIR Form 26 *with* Form 1 for the United States Court of Appeals for the Ninth Circuit Court of Appeals. For the respondent, allowing a case to be summarily dismissed by the Board "is the appropriate procedural result after the practitioner scrutinized the record for errors and/or omissions and identified none." (Exh. 3 at 16.) This is not the appropriate way to handle appeals to an appellate body. Appellate advocacy requires more than a mere boilerplate statement that a judge erred as a matter of law. Moreover, the normal process would be that counsel determine whether an appealable issue exists before filing a Notice of Appeal. By doing otherwise, the respondent frivolously filed Notices of Appeal because she failed to first inquire under the circumstances an appeal "is well-grounded in fact and is warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law and is not interposed for any improper purpose." 8 C.F.R. § 1003.102(j)(1).

The respondent claims that there was no prejudice to Judge Keenan when she failed to file briefs as ordered by the court. She asserted that the judge had all of the information necessary to make a decision in each case and thus a brief would not have changed the outcome of the case. These statements reflect that the respondent does not appreciate the adverse impact of her conduct on the adjudicative process. After questioning by this Court, the respondent admitted in her testimony, that a well-drafted and cogent brief can convince a judge to grant relief even though the judge may have all of the evidence before him. From

the respondent's reaction to this Court's question, it is clear to this Court that it did not even occur to the respondent that a judge could be persuaded by a brief that it ordered a practitioner to file. Moreover, the respondent stated that the *pro bono* clinic did not "have capacity to produce a pre-trial brief." (Exh. 3 at 53.) This lack of understanding and workload issues shows that the respondent's mental state as it relates to the failure to follow court-ordered briefs was certainly reckless at best, but more likely an intentional, flagrant violation of court orders. This Court can come to no other conclusion given the repeatedly violations listed in the NID.

The respondent also blamed her client's for her failure to timely file applications for relief. In each instance related to her failure to file relief, the respondent did nothing to notify the court prior to each scheduled hearing. She never sought a continuance before the hearing and did not notify the judge that her client was uncooperative or a client's whereabouts were unknown. To be sure, the respondent has a responsibility to her client, but she also has an obligation to meet court imposed deadlines and notify the court of her inability to satisfy her duty to comply with those deadlines. 8 C.F.R. §§ 1003.102(o) (stating that competent representation requires a practitioner to be prepared to properly represent a client) and 1003.102(q) (stating that a practitioner should act "with reasonable diligence and promptness in representing" her client and to do so she should control her workload to ensure that she can comply "with all time and filing limitations")

In most cases, as it relates to biometrics requirements, the respondent claimed that the inability of her clients to pay biometric fees should not be held against her. The problem with this explanation is that it demonstrates her mental state of, at a minimum, negligence because the respondent could have sought a waiver of the biometrics fee. 8 C.F.R. § 103.7(c)(3)(i). In her answer, the respondent repeatedly stated that a judge may only waive an application fee, but has no authority to waive biometrics fees. While this is true, the respondent's failure to even request that the judge waive the filing fee for an application for relief, not to mention her failure to request the same from the DHS, demonstrates a complete disregard of her duties as counsel of record. Even if the respondent was unaware that the government could waive the biometrics fees, she certainly could have requested the cost of an application be waived to lessen the financial burden to her clients so that they could pay the biometrics fee.

### 3. The Actual or Potential Injury Caused by the Practitioner's Misconduct

Injury in this context is defined as "harm to a client, the legal system, or the profession which results from a lawyer's misconduct." *In re Dox*, 214 Ariz. at 305 (citing

ABA *Standards* at 12.) Any "level of injury greater than 'little or no' injury[]" is sufficient to find that an injury occurred. *Id*. at 305-06.

The respondent's misconduct injured her clients, the legal system, and the legal profession as a whole. As noted above, the respondent failed to properly review her clients' cases when she filed appeals to the Board. In so doing, she failed to notify the Board with sufficient specificity of the errors of the Immigration Judge's decision. This harmed the legal system and the profession because the Board was left without sufficient information to decide the cases filed on appeal. It also made a mockery of the appellate process by forcing the BIA to summarily dismiss appeals rather than notifying the Board of her intention not to file an appeal. In addition, the respondent did not engage in due diligence to discern whether a colorable appealable issue existed. In the context of court-imposed deadlines, the respondent blatantly ignored court ordered deadlines to file briefs, to file applications for relief, or to ensure her client's completed their biometrics. The failure to do each of these actions caused significant injury to the respondent's clients because in some cases their applications were found abandoned and they were ordered removed from the United States. In at least one case, an alien was ordered removed and lost her lawful permanent resident status. It was only after the case was reopened did that client have an opportunity to file for relief, had a hearing, and was able to maintain her lawful permanent resident status because the judge granted her relief from removal.

Failing to follow court-imposed deadlines or timely filing briefs also affect the legal system and the legal profession. Practitioners cannot knowingly, intentionally, and willfully ignore court orders without having a negative effect on the legal system and the legal profession. The entire legal system and legal profession are premised on the assumption that the parties will abide by court orders or explain their inability to do so. Repeated failures to comply with court orders strikes at the heart of the entire legal system because it jeopardizes the integrity of the process and the ability to adjudicate cases.

### 4. The Existence of Aggravating and Mitigating Circumstances

There are a number of aggravating and mitigating factors in this case. The aggravating factors include—(1) the pattern of misconduct occurring over a period of approximately two years; (2) multiple and repeated violations of the professional code of conduct; (3) the respondent's refusal to acknowledge her misconduct; (4) her substantial experience in the practice of law, particularly immigration law; and (5) prior warnings from Disciplinary Counsel. *See Matter of Levine*, 174 Ariz. 146, 171 (1993) (*en banc*). The respondent's conduct spanned a number of years and occurred even after repeated warnings from two judges about her failure to abide by court imposed deadlines and the Board's

repeated summary denial of appeals she filed. (*See* Exh. 1.) This conduct is particularly troubling given the respondent's extensive experience as an attorney (nearly 40 years) and her refusal, even before this Court when she testified, to acknowledge that she made any mistakes or committed any errors. Instead, she blamed her clients, the Immigration Court, and the regulatory system for her actions. She did not accept responsibility before this Court or in her answer for a single mistake, even though she admits that she failed to file briefs when ordered by the Court. Even when she did admit that she failed to follow court imposed deadlines, she either claimed that the judge had all of the information he needed to make a decision and thus a brief was unnecessary, or she complained that the government did not file a brief either. Whatever the explanation, the respondent failed to appreciate that she repeatedly and willfully ignored court orders and she does not believe such conduct is problematic. *See Matter of Levine*, 174 Ariz. at 172 (stating that a pattern of misconduct may be if a practitioner either faces disciplinary sanctions "with a prior disciplinary record involving the same or similar wrongdoing, or when a [practitioner's] misconduct involves multiple clients")

The mitigating factors in the respondent's case include an absence of a formal prior disciplinary record, her reputation, and the *pro bono* clinic she created to ensure all aliens who cannot afford counsel are represented in immigration proceeding. *See Matter of Levine*, 174 Ariz. at 172. The respondent had a number of witnesses testify on her behalf to explain her commitment to the *pro bono* clinic and to ensure representation of indigent aliens. Nearly all of the respondent's witnesses are pillars of the Tucson community, from the current Mayor of Tucson, to a former United States Attorney, various law professors, and religious leaders. Their testimony uniformly stated that without the respondent there would be no *pro bono* program in the Tucson area for those who cannot afford representation in immigration court. Indeed, one witness, Professor Andy Silvermann, went so far as to suggest that nobody would volunteer to do *pro bono* work in Tucson without the respondent assisting them because immigration law is very complicated. In addition, attorney volunteers are comforted knowing that the respondent is first-chair in each case because they know that somebody with experience is present to assist.

While these witnesses and others testified about the respondent's commitment to help indigent aliens in immigration proceedings—a mitigating factor in the respondent's case—some of the testimony adds to the list of aggravating factors in the respondent's case. For instance, Professor Lynn Marcus was questioned about court deadlines and whether she taught her students about the importance of doing so. She testified that she would hope she would not need to teach her students to meet court imposed deadlines, implying that such knowledge is commonplace. Another witness, Mayor Regina Romero, said the claims

of errors committed by the respondent are disappointing, but that she knew nothing about them. A third witness, Mr. Bates Butler, a former United States Attorney for the District of Arizona, testified that meeting court imposed deadlines is important and if he could not meet such a deadline he would seek an extension of time from the court or talk to the prosecutor. He further testified that the respondent followed all deadlines and requirements in the one case he handled with her in federal District Court in the District of Arizona. Based on Mr. Butler's testimony, her conduct was superb and consistent with the way counsel should act before a court. Of course, as detailed above, this is not how the respondent acted by the Board and the Immigration Courts. Before these bodies, she flouted court orders and routinely ignored deadlines. Frankly, the fact that the respondent knew to follow the rules in federal District Court is another aggravating factor in her case because she is capable of following court orders, yet she routinely chose to flout deadlines and orders by the Board and the Immigration Court.

In weighing the aggravating and mitigating factors in the respondent's case, this Court concludes that the aggravating factors far outweigh the mitigating factors. To be sure, it is admirable, and a significant mitigating factor, that the respondent has attempted to create an organization where underrepresented individuals are able to obtain representation. Great weight has also been given to the respondent's lengthy and apparent "unblemished disciplinary record" over the course of her representation of aliens in immigration courts, the Board, and before the DHS. *See Matter of Mulhall*, 159 Ariz. 528, 768 (1989) (finding an unblemished record prior to misconduct as a mitigating factor).

Despite these significant and weighty mitigating factors, the aggravating factors in the respondent's case are repeated, egregious, and substantial, and they far outweigh the mitigating factors in the respondent's case. The respondent repeatedly failed to file briefs before the Board even though she claimed she would, she repeatedly failed to follow court ordered briefing even though she or a colleague accepted the court-imposed deadline, she repeatedly failed to file applications for relief by court ordered deadlines, and she failed to ensure biometrics were completed despite court orders requiring her clients to do so. She continued this behavior before the Immigration Court even though a number of her clients were either ordered removed or granted voluntary departure without the benefit of having their case heard because the respondent failed to comply with court ordered deadlines. In each instance, rather than accept responsibility for her actions, she blamed others, the permissive language in the regulations, or her clients for her inability to do as she was required as counsel of record. The respondent even attempted to blame the immigration court system for failing to notify her of the problems that it had with her representation of

her clients because it did not follow the requirements of a 2008 memorandum.[23] *See* Operating Policies and Procedures Memorandum (OPPM) 08-01: *Guidelines for Facilitating Pro Bono Legal Services*. In particular, the respondent argued that the OPPM requires that a *pro bono* liaison should be appointed for each court and the liaison, along with the court administrator, "should meet regularly with local pro bono legal service providers to discuss improving the level and quality of pro bono representation at the court." *Id.* at 3. This claim does not excuse or even diminish the respondent's responsibility for a number of reasons. First, even if the pro bono liaison judge and court administrator conducted regular meetings with the respondent, such meetings should not have been designed to notify the respondent that she must comply with court orders. This is a basic tenant of competent representation of a client. No meeting or discussion to improve representation should require a judge to notify a *pro bono* attorney to follow court-imposed deadlines.

Second, the respondent was already warned about her failures to follow court imposed deadlines. All of the appeals listed in the NID were summarily dismissed by the BIA and the regulations warn practitioners that summary dismissal may result in a violation of the professional code of conduct. *See* 8 C.F.R. § 1003.1(d)(2)(iii). Judges Keenan and O'Leary warned the respondent that her failure to file applications or complete biometrics may result in the applications being deemed abandoned. (Exh. 1 at ¶¶ 175, 224, and 246.) And in many cases, the alien's applications for relief were deemed abandoned. (*Id.*) Judge Keenan also explained the need to file briefs. (Exh. 1 at ¶ 129, 137, 147, 155, and 162.) In any event, the respondent was fully aware that the court was concerned and frankly flustered with the respondent's repeated failure to abide by court orders. (Exh. 1 at 17) (judge stating that the respondent has "continuously failed to file briefs in many, many cases, too numerous to count with various excuses.")

None of these excuses demonstrate that the respondent took responsibility for her actions or even believes that she made any mistakes in her practice before the Board or the Immigration Courts. Instead, she deflected blame to others and failed to take responsibility for her conduct. Even when she admitted that she did not file briefs in accordance with

---

[23] The respondent also claimed to be a "friend of the court" operating in a *pro bono* capacity. The respondent's characterization of her representation of her clients is mistaken. A "friend of the court" does not represent a client before the Court. Rather, "friend of the court" is designed to provide the court "in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." *Miller-Wohl Co., Inc. v. Commissioner of Labor and Industry of State of Mont.*, 649 F.2d 203, 204 (9th Cir. 1982). "Friend of the court" are not parties to the litigation. *Id.* (citing *Clark v. Sandusky*, 205 F.2d 915, 917 (7th Cir. 1953)).

Judge Keenan's orders, she explained that the briefs were unnecessary and the government also failed to file a brief. (Exh. 3 at 47-48, and 53.)    No disciplinary sanctions will mean that others similarly situated will also believe that such excuses are sufficient to escape responsibility for following court orders.  The public interest will not be served if the respondent is not subject to discipline for her actions.

The respondent seems to argue that she has fixed the issues that are the subject of the NID because she now has hired Mr. Philip Kennedy as a law office administrator. *See Matter of Levine*, 174 Ariz. at 173 (stating that significant rehabilitation like a mentoring program and continuing legal education addressing specific ethical rule violations are mitigating factors).  Mr. Kennedy, the respondent argues, has signal-handedly changed the nature of the clinic and the ability of the clinic to ensure that all deadlines are met.  This is an overstatement of the effect of hiring Mr. Kennedy based on the evidence presented by the respondent herself.[24]

Mr. Kennedy began working as the law office administrator in December 2018. Three other full-time staff also work at the clinic.  Mr. Kennedy testified that the *pro bono* clinic handles approximately 500-600 active removal cases, approximately 3,000 Deferred Action for Childhood Arrivals (DACA) cases, and 3,000 United States citizenship cases. Mr. Kennedy claimed that after creating a tracking system no deadlines have been missed, particularly because a responsible individual is placed in the system.  The record evidence, however, tells a different story.  It shows that the calendar instituted by Mr. Kennedy is no different than the calendar that was previously used and even if the format is different, the content and usefulness of the calendar is suspect.  For instance, the calendars used before Mr. Kennedy worked as the law office administrator and after he was hired are nearly identical in terms of content.  (Exh. 3 at Exh E; Exh 6 at Tabs A and B.)  There are no attorneys listed as responsible for any of the cases in the calendar.  (*Id*.)  There are also no deadlines in the calendar, but they are apparently in a separate spreadsheet maintained by Mr. Kennedy.   Finally, while the work Mr. Kennedy has done is admirable and praiseworthy, it does not change the fact that he is the only possible stop-gap to ensure that all court ordered deadlines are met, that all hearings are attended by some counsel from the clinic, and that clinic clients will have sufficient warning of their obligations to provide information to their *pro bono* attorney.  It appears to this Court that the issues that brought

---

[24]   This statement should not be construed to suggest that Mr. Kennedy is not a hard-working, dedicated employee of the clinic.  It appears, by all accounts, that Mr. Kennedy is doing his level-best to help organize the clinic to work more efficiently.  Despite his efforts, however, the respondent has failed to ensure that the new procedures fixed the issues raised in the NID.

this case before this Court will not change merely because Mr. Kennedy has made changes to the tracking of cases within the clinic.

## C. The Appropriate Sanction

As noted above, the regulations give this Court no guidance on the type or length of sanction that it should impose, even in circumstances that mandate a sanction. From the broad language in the regulations, this Court concludes that it has wide discretion to fashion an appropriate sanction based on the factors discussed above.

In determining the appropriate sanction, this Court "bear[s] in mind that the primary objectives of lawyer discipline are (1) to protect the public and the courts and (2) to deter the disciplined attorney and others from engaging in the same or similar conduct." *Matter of Alexander*, 232 Ariz. 1, 16 (2013) (*en banc*) (citation, internal quotation marks, and brackets omitted). "Fulfilling these objectives promotes confidence in the integrity of the disciplinary process." *Id*. (citation omitted). Disciplinary sanctions are "not intended to punish the disciplined lawyer, although it may have that effect." [25] *Id*. (citation omitted).

In considering each of the ABA factors discussed above, this Court concludes that an indefinite suspension, but one not less than five years is appropriate. In addition, before seeking reinstatement, the respondent shall demonstrate her rehabilitation by providing an affidavit, under oath, to explain the changes she has made in the *pro bono* clinic to ensure these violations will never happen again. In fashioning an appropriate sanction, this Court weighs the ABA factors discussed above and finds that the respondent's conduct and her inability to accept responsibility for her actions requires that she demonstrate some rehabilitation before seeking to be reinstated to practice before the Immigration Courts, Board, and the DHS. Moreover, the issued sanction is appropriate because of the respondent's repeated failure to determine whether an appeal was warranted in the cases discussed above, her repeated failure to file briefs when ordered to do so, and her failure to timely file applications for relief or ensure her client's completed their biometrics. The respondent's conduct demonstrates a total disregard for the rules that govern the practice of law before the Immigration Courts and the Board. Her "no harm no foul" attitude is deeply troubling to this Court. *Matter of Breen*, 171 Ariz. 250, 255 (1992). The respondent repeatedly stated that summary dismissal of appeals she filed was part of the process and

---

[25]  Normally, a proportionality review would be appropriate to determine how other respondents were sanctioned to ensure proportionate sanctions for similar conduct. *Matter of Alexander*, 232 Ariz. at 15. A proportionality review in this case, however, is of little help because this Court is unaware of a similar or comparable case. *Id*. Consequently, this Court tailors the sanction imposed to the "unique circumstances of this case." *Id*. (citation omitted).

that a failure to file briefs to demonstrate eligibility for relief was unnecessary because the judge had all of the information he needed to make a decision. This behavior diminishes "the confidence a client has in his attorney and" detracts "from the integrity of the legal profession, not only in the eyes of" clients "whose interests were compromised, but in the eyes of the public at large." *Id.*

This Court looks to "the most serious charge [of misconduct which] serves as the baseline for" the sanction to be imposed. *In re Moak*, 205 Ariz. 351, 353 (2003) (*en banc*) (citing *In re Cassalia*, 173 Ariz. 372, 375 (1992)) . The less serious charges are assigned "aggravating weight." *Id.* (citing *Matter of Cassalia*, 173 Ariz. at 375). A lawyer's duty and obligations to her client is one of the most important ethical duties. *Matter of Augenstein*, 178 Ariz. 133, 136 (1994) (*en banc*). The respondent failed a number of clients when she did not timely file applications for relief or ensure that biometrics were timely completed. In one case, a lawful permanent resident was ordered removed, only later to have her case reopened by another attorney and obtain relief from removal.[26] The harm the respondent caused to these clients is significant, particularly those who face deportation and thus banishment from the United States. These harms to the respondent's clients were "especially egregious in light of what was at stake in [her] representation." *Matter of Wolfram*, 174 Ariz. 49, 59 (1993) (*en banc*). Various clients had their applications found abandoned because no application was filed or because biometrics were not completed. This meant that these clients could not try to persuade a judge to grant them relief from removal, many of whom were ordered removed from the United States. "The impact of deportation upon the life of an alien is often as great if not greater than the imposition of a criminal sentence." *Bridges v. Wixon*, 326 U.S. 135, 164 (1945). Often the results of deportation are dire. "A deported alien may lose his family, his friends, and his livelihood forever . . . [and] return to his native land may result in poverty, persecution, and even death." *Id.* By failing to file applications, ensure biometrics were completed, or follow court-imposed deadlines to file briefs in order to persuade a judge to grant relief, the respondent's actions resulted in clients who did not have a chance to properly present their cases or to present them at all. Such conduct screams for severe disciplinary sanctions because the respondent totally abandoned her clients in their most desperate time of need.

---

[26] While this Court does not find that Judge Keenan's conclusion that the respondent was ineffective is a *per se* violation of the ethical rules, it does conclude that the respondent's failure to file an application for a lawful permanent resident who eventually obtained relief from removal is an egregious violation of her ethical obligations. *See Matter of Wolfram*, 174 Ariz. 49, 54 (1993) (*en banc*) (finding that a successful or unsuccessful ineffective assistance of counsel claim is not a *per se* rule that an attorney has committed an ethical violation).

The respondent's conduct was also prejudicial to the administration of justice and undermined the integrity of the adjudicative process. The respondent acted frivolously by filing appeals that she did not have a legal basis to file, which cost time, energy, and resources for the Board to decide those cases. This conduct was not a singular or rare event, but instead occurred repeatedly over the span of years. Reviewing other disciplinary cases in Arizona, this Court finds that the respondent's actions are most similar to an abuse of legal process. *Matter of Levine*, 174 Ariz. at 171. The respondent repeatedly failed to comport her conduct consistent with respect for the legal process. She failed to file briefs with an appellate body, even though she notified that body that she would do so. She failed to file briefs regarding her client's eligibility for relief, even though she was ordered to do so. And she failed to timely file applications for relief or ensure her clients' biometrics were completed by court ordered deadlines. Despite all of these failures, the respondent has consistently failed to take responsibility for her actions. She has blamed her clients, the regulatory process, and judges for ordering briefs when, as she claims, all of the evidence was before the court.

In arriving at the sanction in this case, this Court has weighed all of the factors discussed above and found that the respondent's conduct is egregious especially in light of her extensive experience. This Court has also considered the suggested sanction proposed by the respondent made during closing arguments. The respondent stated that any suspension would be disastrous to the community because nobody else could take over the *pro bono* clinic and that any suspension would "add misery" to her clients. She suggested a warning letter, a requirement that she reduce her caseload, and a recommendation that she meet monthly with the *pro bono* liaison judge to improve her representation. The respondent further suggested that this Court could monitor the respondent's progress to ensure she abided by the rules and deadlines.

These proposed sanctions are insufficient based on the lengthy, repeated, and varying types of violations of the professional rules of conduct. This is particularly true when the respondent failed to show remorse or change her behavior, even though she was continually warned by judges about her failure to follow court-imposed deadlines. Despite these warnings, the respondent continued to disregard deadlines and she made excuses for her failures. The sanction imposed ensures that the public is protected from her conduct because this Court is not confident that she will change her behavior without severe sanctions. To be sure, this sanction will certainly have an impact on the *pro bono* clinic the respondent has built to serve the underrepresented in the Tucson area, but this Court is obligated to ensure that all of those represented in Immigration Courts and the Board are properly represented. The respondent's conduct demonstrates a total disregard of the rules,

and the effect her conduct has on her clients and the adjudicative process. In end, this Court does "not consider the nature of the lawyer's practice, the effect on the lawyer's livelihood, or the level of pain inflicted when determining the appropriate sanction." *In re Scholl*, 200 Ariz. 222, 224 (2001) (citing *In re Shannon*, 179 Ariz. 52, 71 (1994)).

Accordingly, the Court enters the following Orders:

**IT IS HEREBY ORDERED** that all factual allegations have been proven by clear and convincing evidence, including factual allegations 11-13, 177-178, and 260;

**IT IS FURTHER ORDERED** that all of the allegations related to violations of the professional code of conduct in Counts 1-24 are **ADOPTED** with the exception of the charge in Count 10 related to violations of 8 C.F.R. §§ 1003.102(j) and 1003.102(o), which are **DISMISSED**;

**IT IS FURTHER ORDERED** that the respondent shall be disciplined for her violations of the professional code of conduct before the Immigration Courts, the Board of Immigration Appeals, and the Department of Homeland Security;

**IT IS FURTHER ORDERED** that the respondent shall be suspended from the practice of law and appearing before the Immigration Courts, the Board of Immigration Appeals, and the Department of Homeland Security, for an indefinite period of time, but for no less than 5 years from the issuance of this Order; and

**IT IS FURTHER ORDERED** that the respondent shall, prior to reinstatement, file an affidavit, under oath, explaining the changes she has made to her practice to ensure the violations that are the subject of this Order do not occur in the future.

MUNISH SHARDA

Digitally signed by
MUNISH SHARDA
Date: 2020.12.08
10:02:07 -07'00'

Munish Sharda, Adjudicating Official
Immigration Judge

**APPEAL RIGHTS:** Both parties have the right to appeal the decision of the Immigration Judge in this case. Any appeal must be received by the Board of Immigration Appeals within thirty calendar days from the date of service of this decision.